**STATE of Missouri, Respondent,**

v.

**Othel Leroy FUNK, Appellant.**

**No. KCD26226.**

Missouri Court of Appeals,
Kansas City District.

Jan. 19, 1973.

Robert G. Duncan, Duncan & Russell, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Daniel P. Card, II, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, SWOFFORD and WASSERSTROM, JJ., and HARRY A. HALL, Special Judge.

WASSERSTROM, Judge.

Defendant appeals from a conviction for illegal possession of methamphetamine hydrochloride. No evidence was introduced for the defense, and the testimony of the police officers stands undisputed. That testimony, together with a stipulation by the parties of certain limited facts, set forth the factual situation for consideration.

On January 20, 1971, the police made arrangements for what is known in police parlance as "a controlled buy" of drugs by Johnny Shelton, who is termed in police jargon "a cooperating individual" and more

commonly known as an informer. As a preliminary, Shelton was searched by the police and after ascertaining that he. had no articles in his possession, the police officers handed Shelton $65.00 in identified bills. Then Shelton, accompanied by the police officers, drove directly to the residence occupied by the defendant. There the informer went inside the house and stayed approximately four minutes. At the end of that time, he came to the door with the defendant.

Shelton then walked to the car where he handed over a vial containing 100 tablets, subsequently found to be methamphetamine hydrochloride. Shelton also told the officers at that time that there were more drugs in the house and that they were located in the left-hand dresser drawer in the northeast bedroom. The officers then proceeded with Shelton to a nearby gas station where he was again searched. The officers found that the $65.00 was gone and that Shelton had nothing else in his possession.

Two of the officers then went to obtain a search warrant. Other officers remained to keep a surveillance of the defendant's house, and at the same time a police helicopter was assisting the surveillance from its overhead vantage point.

Pursuant to police application, a search warrant was issued by Magistrate Bills authorizing a search of the defendant's residence for "a quantity of Methamphetamine Hydrochloride, a stimulant drug". Armed with this search warrant, the officers returned to defendant's house. They knocked on the door and announced themselves as the police. When no answer was received, they broke in and immediately went to the northeast bedroom where they found Mrs. Funk clad in lounging pajamas. Officer Eapmon went at once to the left-hand dresser drawer, where Shelton had said drugs would be found, and various bottles containing methamphetamine hydrochloride were discovered there. A thorough search proceeded of the entire house,

and approximately $10,000.00 was found hidden in the basement. The police also encountered in the house the defendant and a teen-age son of Mrs. Funk by a previous marriage.

After the search was completed, both the defendant and his wife were arrested, and an additional sum of approximately $1,-000.00 was found in their personal possession. Among the money thus discovered were $60.00 of the identified bills which the police had given Shelton to be used for "the controlled buy".

Defendant makes two points on this appeal: (1) that his motion to suppress the evidence obtained by reason of the search should have been sustained, and that those fruits of the search should have been excluded from evidence; and (2) that even if the fruits of the search be considered, still the prosecution failed to make a submissible case of illegal possession by the defendant. Inasmuch as we decide in defendant's favor on the first of those points, it is unnecessary to rule on the second assignment, although the same general question in more circumscribed form will be discussed under Point III of this opinion.

## I

Defendant contends that the motion to suppress should have been sustained because: (a) the search warrant was not authorized by any statute; and (b) the affidavit upon which the warrant was issued was legally insufficient. Since we sustain the first of those arguments, the second need not be considered.

■ If the search warrant were being issued currently, such action would be authorized under § 195.135, V.A.M.S. That section now provides that "a search warrant may issue, and execution and seizure may be had * * * for any controlled substance unlawfully in the possession or under the control of any person * * *". However, prior to the 1971 amendment by H. B.No.69, approved June 29, 1971, and not

effective until September, 1971, this section was narrower and authorized only the search for and seizure of "narcotic drugs". The search warrant in the present case specifically confined the purported authority thereunder to a search for "Methamphetamine Hydrochloride, a stimulant drug". Unless methamphetamine hydrochloride, the drug described, came within the statutory term "narcotic drug", there could be no statutory authority for the warrant as issued.

The statute itself, § 195.010(17) RSMo 1969, V.A.M.S., defined "narcotic drugs" as meaning "amidone, bemidone, cannabis, CB–11 (also known as heptazone or heptalgin), coca leaves, isoamidone, isonipecaine, keto-bemidone, N.I.H.–2933, N.I.H.–2953, NU–1196 (also known as Nisentil), NU–1779, NU–1932, NU–2206 and opium and every substance neither chemically nor physically distinguishable from them and any other drugs to which the federal laws relating to narcotic drugs may now apply." This definition does not encompass methamphetamine hydrochloride, and the State does not now so contend.

■■ By reason of the foregoing analysis, the State cannot and does not claim that the search warrant in issue was authorized by § 195.135; but it does contend that the search warrant was authorized under the terms of § 542.380(3), V.A.M.S. The latter section authorizes search warrants for "pills, powders, medicines, drugs or nostrums, or instruments or other articles or devices for producing or procuring abortion or miscarriage, *or other indecent or immoral use* * * *". (emphasis added) The State relies upon the quoted words emphasized and claims this phrase to be broad enough to include stimulant drugs. That argument proves too much and cannot be accepted. If this interpretation were true, there would have been no need at all for the original section 195.135, much less any need for the legislature to amend the latter section in 1971 so as to expand its scope. As a matter of fact, Chapter 195

entitled "Drug Regulations" is a complete code in itself. § 542.380(3) cannot reasonably be understood as being intended to apply to the subject of drug control, as to which the legislature has made other comprehensive provision in Chapter 195. The phrase "other indecent or immoral use" as contained in § 542.380(3) must be construed as referring to items of a sexual nature.

Since there is no statute which can be said to have authorized this search warrant at the time it was issued, the search warrant cannot be regarded as legally effective. See In the Interest of J.R.M., Mo.Banc, 487 S.W.2d 502; State v. Allison, Mo., 466 S.W.2d 712, 1. c. 714; Scurlock, "Basic Principles of Administration of Criminal Justice with Particular References to Missouri Law", 38 UMKC Law Rev., 167, 1. c. 194–195.

II

As a second line of defense, the State retreats to the position that the search of the defendant's home can be justified as incident to a lawful arrest. It is questionable whether the evidence appearing of record in this case shows any reasonable ground before the police forced entry into the house, for the arrest of Mrs. Funk, the only suspect who was in the northeast bedroom at the time the search began, or any other particular person for that matter.

The police themselves seemed to share this doubt at the time as evidenced by the fact that they made no attempt to make any arrest immediately after checking the results of Shelton's "controlled buy", but instead they repaired to a magistrate in order to obtain a search warrant in the hope of obtaining further evidence. Absent reasonable grounds for arrest, there could be no predicate for a lawful search as incidental to the arrest. However, we pass this question since there are three other reasons why the search must be condemned, even if it be assumed that the police officers

did have reasonable grounds for arrest before entering the house.

■ A. The first reason that the search cannot be sustained as an incident to the arrest is that the search preceded the arrest. The classic statement of the exception permitting a warrantless search incidental to an arrest includes a flat requirement that the arrest precede the search in point of time. State v. Morice, Mo., 79 S.W.2d 741, 1. c. 742; State v. Witherspoon, Mo., 460 S.W.2d 281, 1. c. 285.

This requirement has been relaxed by recent decisions in circumstances where the police have reasonable cause in advance to make an arrest, without reference to the evidence later obtained as a result of the search. United States v. Taylor, C.A. 8, 428 F.2d 515, 1. c. 519–520; United States v. Skinner, C.A. 8, 412 F.2d 98; Holt v. Simpson, C.A. 7, 340 F.2d 853, 1. c. 856; concurring opinion of Mr. Justice Harlan in Sibron v. New York, 392 U.S. 40, 1. c. 76–77, 88 S.Ct. 1889, 20 L.Ed.2d 917; "Lawfulness of Nonconsensual Search and Seizure without Warrant, Prior to Arrest," 89 A.L.R.2d 715. The reasoning of these authorities is that the only purpose of looking at the precise order of occurrence between the arrest and search is to make sure that the police do not attempt to justify the arrest by the results of an illegal search, thereby raising themselves by their own bootstraps. Insistence upon reasonable cause before making the arrest eliminates that possibility.

Nevertheless, even these liberalizing decisions must require that the search and the arrest be "substantially contemporaneous" in order for the evidence seized to be admissible. This requirement is necessary in order to meet the rationale of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, and Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409, under which the sole justification for this entire exception of search incident to an arrest is to permit police officers to protect themselves against the possibility of the person arrested seizing hold of a weapon or destructible evidence.

■ Even assuming that the Morice and Witherspoon decisions of the Missouri Supreme Court can be construed in light of their facts as not being inconsistent with the liberal opinions cited above,[1] still the facts of this case do not square with the requirement that the search and the arrest be substantially contemporaneous. This is shown beyond peradventure of doubt by the stipulation entered into between parties in connection with defendant's motion to suppress evidence. It is there agreed that the police officers commenced their search in the northeast bedroom, that the search then proceeded through the entire house, and that it was only then after the search had concluded that any arrest was made. Obviously, a search of this extensiveness was not concluded quickly and represents a far cry from the few "moments" that intervened between the search and arrest in the Taylor and Skinner cases. Accordingly, whether we apply the strict classic test stated in Morice and Witherspoon, or the more liberal test stated in such cases as Taylor and Skinner, the same conclusion must be reached, that the search which occurred here cannot be justified as being incidental to an arrest.

■ B. The second reason for refusing to sustain the search as incident to an arrest is that the police in this case entered the house for the precise purpose of making a search not for the primary purpose of making an arrest.

This stands out clearly from the facts stated by the officers themselves. After the search warrant was obtained, Officer Linhart "handed the warrant to Detective Eapmon to execute." In describing what the officers did when they entered the

---

[1]. The opinion of the Missouri Supreme Court in State v. Rhodes, 316 Mo. 571, 292 S.W. 78, is susceptible of interpretation as adopting the liberal view in question. See discussion of the Rhodes case in 89 A.L.R.2d 1. c. 753.

house, the State's brief says they "executed the search warrant". Furthermore, on entering the house, Officer Eapmon went directly to the northeast bedroom. Although he saw Mrs. Funk there, he did not pause to ask any questions but proceeded immediately to the left-hand drawer of the dresser where he had been told in advance that he would find the drugs for which the search warrant had been issued.

Under these circumstances, it can hardly be said that the search was incident to an arrest. Rather, more properly speaking the arrest was incident to and as a result of the search. No arrest was made until after the officers had obtained the evidence for which they were looking and on the basis of which they felt that a case against the Funks could be successfully prosecuted. The case therefore falls within the principle stated in 89 A.L.R.2d, 1. c. 721:

> "However, in cases in which it has appeared that an officer's purpose in entering a residence was primarily to make a search rather than to make an arrest, and the search preceded arrest, it has been held that such search without a search warrant was unlawful."

■ C. The third and most compelling basis of all for holding the search and seizure in this case to be unreasonable is that its scope was much too broad. The permitted scope of a search incidental to an arrest is authoritatively stated in Chimel v. California, 395 U.S. 752, 1. c. 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685. The Supreme Court in that case held that as incident to an arrest the arresting officers may search "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence". The opinion then goes on with the following observation which is particularly pertinent to our own situation:

> "There is no comparable justification, however, for routinely searching any

room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less."

Even if we should assume all other points in favor of the State, nevertheless the area of the search here directly violates the foregoing rules laid down in Chimel. The only person in the bedroom when the search started was Mrs. Funk, and there is no showing by the State's evidence that Mrs. Funk was close enough to the dresser in which the officers found the drugs so that she might have been able to grab a weapon or destructible evidence. What is more, the dresser drawer was exactly the kind of "closed or concealed area" which the Supreme Court says cannot be searched except under the authority of a valid search warrant.

The State recognizes the hurdle presented to it by the Chimel doctrine, and it attempts to surmount that problem by arguing that Mrs. Funk was in a state of undress and that the officers were entitled to search the room before leaving her alone to get dressed preparatory to going to the police station. This attempt to limit constitutional rights under the guise of modesty cannot be accepted. There is no reason why Mrs. Funk could not be taken to the police station in lounging pajamas. Any coat deemed necessary for her comfort or appearance could have been taken from a closet by any of the policemen present. An alternative solution would have been for the policemen to maintain Mrs. Funk under direct watch in the bedroom until such time as they could call in a police matron to replace them while Mrs. Funk got dressed. Moreover, the concern now expressed by the State for the prevention of Mrs. Funk being permitted access to destructible drugs was apparently less important at the time

than they try to make it appear now, since the record shows that Mrs. Funk did somehow obtain possession of drugs which she attempted to flush down a toilet after she arrived at the police station.

For each of the three reasons outlined, the search here cannot be justified as being incidental to a valid arrest. The search having been illegal, the evidence secured thereby should have been suppressed. The admission of that evidence and permitting consideration thereof by the jury constitutes reversible error.

### III

Even though the results of the search were not admissible, that holding does not affect the 100 tablets of methamphetamine hydrochloride which were obtained by Shelton from within the Funk house. This raises the question whether the evidence concerning those 100 tablets and the "controlled buy" constitutes a sufficient showing of possession by defendant to warrant submission to a jury. If so, this case should be remanded for new trial, rather than being reversed outright.

From the fact that Shelton went into the Funk home with $65.00 and no pills and came out of the Funk home with pills but without the $65.00, a rational mind can conclude that Shelton got the 100 tablets from someone in the Funk residence. In view of the constant surveillance which was maintained over the Funk residence from the time Shelton left until the officers broke in to make their search, a rational mind can also infer that one of the three persons found by the officers within the house had to be the source from whom Shelton received the drugs. The question remains whether possession of those drugs so delivered can reasonably be attributed by a jury to defendant individually as the basis for a criminal conviction.

The evidence indicates that title to the house was in the sole name of Mrs. Funk, but that defendant lived there and con-tributed toward or made the mortgage payments. We can assume that this state of affairs constituted a situation in which defendant had joint possession and control with his wife over the home as a family residence. It is important to note that defendant's teen-age step-son also shared possession of the premises. The question presented by these facts is whether defendant's joint possession of the premises supports an inference that he was in possession and control of the 100 tablets of drugs which were located therein and delivered to Shelton.

In narcotics cases, the law has developed a policy that a person in exclusive control of premises will be deemed to have possession and control of any drugs or related items found on those premises. The basis for this inference is well stated in People v. Nettles, 23 Ill.2d 306, 178 N.E.2d 361, l. c. 363:

"This inference is based largely upon the nature of the commodity and the manner in which its illegal traffic is conducted. By law the use of narcotics, except for specified medicinal purposes, is rigidly condemned. Because of this illegitimate nature of narcotics, they are sold for exorbitant sums on the black market and are therefore of great value to the person possessing them. Furthermore, since their mere possession may subject such person to severe criminal consequences, the narcotics traffic is conducted with the utmost secrecy and care. Human experience teaches that narcotics are rarely, if ever, found unaccountably in a person's living quarters.

"We are of the opinion, therefore, that where narcotics are found on the premises under the control of defendant, this fact, in and of itself, gives rise to an inference of knowledge and possession by him which may be sufficient to sustain a conviction for unlawful possession of narcotics, absent other facts and circumstances which might leave in the mind of the jury, or of the court where

a jury is waived, a reasonable doubt as to his guilt. See People v. Embry, 20 Ill. 2d 331, 169 N.E.2d 767; People v. Mack, 12 Ill.2d 151, 145 N.E.2d 609."

Among numerous cases following and applying this rule are: King v. State, 169 Tex.Cr.R. 34, 335 S.W.2d 378; Gonzales v. People, Banc, 128 Colo. 522, 264 P.2d 508; People v. Francis, Banc, 71 Cal.2d 66, 75 Cal.Rptr. 199, 450 P.2d 591; People v. MacArthur, 126 Cal.App.2d 232, 271 P.2d 914; United States v. Bridges, C.A.8, 419 F.2d 963, 1. c. 968.

Some of the cases just cited and others in the same line state broadly that the same principle may be applied even where the defendant does not have exclusive control of premises, since there may be joint control with the same consequences as if there were exclusive control. However, the more carefully considered cases on this subject draw a distinction between exclusive control and joint control. These latter cases hold that possession and control of the illegal drugs can be attributed to the defendant based on the bare fact of exclusive control of premises, but that if his control is merely joint with one or more others, then there must be some further evidence or admission connecting the defendant with the illegal drugs. A careful reading of the cases which state the rule more broadly will each be found consistent on its facts with the more narrowly framed distinction. This distinction is well stated in the leading case People v. Antista, 129 Cal.App.2d 47, 276 P.2d 177, 1. c. 179–181. In that case where the defendant did not have exclusive access to the apartment where the marijuana was seized, the court held that the joint right of access without more was not a sufficient basis upon which to find him guilty of possession of marijuana:

"Guilty knowledge is not presumed. It has to be established by evidence. In a sense it can be said that one has possession of everything that is contained in the home or apartment in which he lives but this is not the sense in which 'possession' is used in the penal statute. In all the cases we have examined in which conviction was upheld there was some incriminating statement or circumstance in addition to the presence of marihuana or narcotic which indicated knowledge of the defendant of its presence and his control of it."

\*    \*    \*    \*    \*    \*

"Exclusive control and dominion over a car found to contain a narcotic is, of course, a potent circumstance on the question of possession of its contents.

"Upon the other hand, when there has not been exclusive possession of a car, the presence in it of marihuana cigarettes while the owner is seated in it with a friend, has been held insufficient to prove possession by the owner of the substance in the absence of any statement by him or any circumstance tending to prove his knowledge of its presence."

\*    \*    \*    \*    \*    \*

'Defendant did not have the burden of establishing lack of knowledge. The burden was on the state to prove facts from which knowledge could fairly be inferred. It may be that evidence that defendant had substantially exclusive access to the apartment would have been sufficient. The evidence of the state established that others, also, had access. It may be that a false explanation of the presence of the marihuana, or conflicting statements of the defendant, would have been sufficient. If the substance had been found in the personal effects of the defendant that would have been a potent circumstance indicating knowledge of its presence, ownership and control. Such is the nature of the circumstantial evidence found in many of the cases. But we believe no precedent will be found for the affirmance of a conviction in the absence of some comparable circumstances. We hold that if it is established that one accused of possession returned to his apartment, or to his automobile, and

found it occupied by a user of narcotics, and a narcotic was found in it, and if there is no evidence that it was there before that time, the fact of its presence, without any other fact or circumstance of an incriminating nature, is legally insufficient to prove a charge of possession."

The same rule was adopted and followed in Evans v. United States, C.A. 9, 257 F. 2d 121, l. c. 128:

"Proof that one had exclusive control and dominion over property on or in which contraband narcotics are found, is a potent circumstance tending to prove knowledge of the presence of such narcotics, and control thereof. People v. Antista, supra.

"Where one has exclusive possession of a home or apartment in which narcotics are found, it may be inferred, even in the absence of other incriminating evidence, that such person knew of the presence of the narcotics and had control of them.

\* \* \* \* \* \*

"But, since he was not in exclusive possession of the premises, it may not be inferred that he knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. See People v. Antista, supra."

Accord: Feltes v. People, Colo.Sup., 498 P.2d 1128, l. c. 1131 and 1132; People v. Davenport, 39 Mich.App. 252, 197 N.W.2d 521; Bass v. United States, C.A. 8, 326 F. 2d 884, 887.

Missouri appears to follow the rule recognizing a distinction between exclusive control and joint control of the premises where drugs are found. In State v. McGee, Mo.Sup., 473 S.W.2d 686, l. c. 687, three college students rented a house. This house came under police surveillance, and one evening the police obtained a warrant and entered to make a search. They found the defendant and a number of friends sitting around a large table on which marijuana was located. The court held that there was insufficient evidence to sustain a conviction of possession by the defendant McGee:

"In the totality of these circumstances it is not necessary to consider the niceties of the statutory offense of possession of marijuana, joint control, knowledge—even the essential elements of the offense and the standards of proof. It is sufficient here to say that there were no corroborating, incriminating circumstances—in addition to joint control of the premises as in State v. Burns, Mo., 457 S.W.2d 721 and State v. McAllister, Mo., 468 S.W.2d 27, in which the cases are collected and the niceties of proof and the differentiating circumstances are noted. As stated, the only proof here is of joint control of the premises and at the search the insufficient circumstance of McGee's 'proximity to persons or locations with drugs about them.' Annotation 91 A.L.R.2d 810."

Can it be said that the family relationship between the three people in the Funk house constitutes a sufficient "corroborating incriminating circumstance" within the meaning of the above cases? An affirmative answer is indicated by Landers v. State, 114 Ga.App. 687, 152 S.E.2d 431. In that case, officers entered defendant's house with a search warrant and found narcotics. It was stipulated that title to the house was in defendant's wife. The court nevertheless held that the family relationship was sufficient to raise a rebuttable presumption of possession of the narcotics by the defendant husband:

" 'When husband and wife reside together, he is the head of the house, whether it be owned by or be rented to the one or the other.'

\* \* \* \* \* \*

"Therefore, even if legal title to the real estate was in the wife, the defendant was the head of the household and pos-

session of the narcotics was presumed to be his. Sutton v. State, 57 Ga.App. 251, 195 S.E. 219; Pirkle v. State, 54 Ga.App. 203, 187 S.E. 602. The jury was authorized to find that the presumption was not rebutted."

Even if the ruling in Landers were to be adopted, the facts of the present case are distinguishable because of the presence here of the teen-age step-son. In view of the relaxed state of parental control in today's society, it would be unrealistic to hold a father (much less a step-father) to constructive knowledge of and control over everything which a teen-age son may bring into the family home.

 Furthermore, although the decision of this case does not require an acceptance or rejection of the precise ruling in Landers, that ruling is not persuasive. The day when a husband could be regarded as the unquestioned "head of the house" has become part of a past which is no doubt nostalgic to some, but which is nonetheless gone. Wives are entitled to and now have such a degree of emancipation that it is not consistent with fact or current mores to hold that a husband is criminally accountable for everything which his wife brings into the family domicile.

The only bit of evidence offered against the defendant here, other than the joint possession and control of the premises and the family relationship, was the fact that defendant came to the door when Shelton left after making the "controlled buy". This one additional factor does not constitute any substantial tying of the defendant to possession of the 100 tablets before they were obtained by Shelton. This results in the reluctant conclusion that there is insufficient basis in the evidence so far produced by the State upon which a valid conviction can rest.

The record shows that unfortunately Shelton has been shot to death and his testimony as to what happened inside the Funk house when he made his "controlled buy" is not available and would not be available at a retrial. Nevertheless, this case will be remanded to afford the State an opportunity for a retrial in the event there is other and further evidence which it can adduce.

The judgment is reversed and the cause remanded.

All concur.