The **UNITED STATES**
v.
**Joseph A. CHADWICK et al.**
**Crim. No. 73–239–T.**

United States District Court,
D. Massachusetts.

Jan. 13, 1975.

Supplemental Opinion April 10, 1975.

Larry Cohen, Asst. U. S. Atty., for the United States.

Philip S. Nyman, Lowell, Mass., for Machado.

Robert L. Steadman, Boston, Mass., for Leary.

Kevin M. Keating, Anthony M. Arena, Martin Weinberg, Boston, Mass., for Chadwick.

## OPINION AND ORDER

TAURO, District Judge.

Defendant Joseph Chadwick and his two co-defendants, Bridget Leary and Gregory Machado, are charged in a two count indictment with possessing marijuana with intent to distribute, and with conspiring to possess with intent to distribute.

Before the court is Chadwick's motion to suppress the fruits of warrantless searches of a footlocker, two suitcases, and of his person. The searches were conducted by government agents some time after his arrest outside the South Station railroad terminal on May 10, 1973. He has also moved to suppress statements made by him after his arrest.

In support of his motion, Chadwick asserts 1) that his warrantless arrest was without probable cause; 2) that there was no justification for a search of his person; 3) that although he was in a custodial situation when he made statements to federal agents, he was not warned of his rights; and 4) that the warrantless search of the footlocker and luggage cannot be justified by any exception to the requirements of the Fourth Amendment.

Following the hearing on Chadwick's motion to suppress, defendant Leary filed a motion to suppress all evidence obtained by the warrantless searches of the footlocker and suitcases that were seized by the federal agents. She also moved to suppress any statements made by her following her arrest on the grounds that the arrest was made without probable cause. Both Leary and Chadwick rely on the same grounds for suppressing the evidence obtained as a result of the warrantless search of the footlocker.[1] The Government has chosen

---

1. Marijuana was found in both of the suitcases as well as in the footlocker. For convenience in reference and because the items searched are legally indistinguishable, both the Government and the defendants have focused on the footlocker. While some factual details are different (the suitcases were not leaking talcum powder; the dog alerted to the footlocker, not the suitcases; the suitcases were smaller than the footlocker; there was no evidence of a second lock on the suitcases; the information from San Diego related to the footlocker, not the suitcases), none of these factors, either singly or in combination would warrant a different result on the motion to suppress. Accordingly, the decision of this court applies to both the suitcases and the footlocker.

to rely on the same argument in opposition to both motions. Accordingly, the motions to suppress are consolidated in this opinion.

The circumstances surrounding the defendants' arrest and the subsequent search are as follows.

On May 8, 1973, federal agents in Boston received reliable information from their San Diego counterparts that a footlocker suspected of containing marijuana was being shipped by train to Boston. This information indicated that the trunk in question was leaking talcum powder, a substance used to mask the odor of marijuana, and that the shipper, the defendant Machado, fit a profile used by Amtrak officials to spot drug traffickers. The destination address of the footlocker was Machado's Massachusetts residence. Machado obtained passage for two to Boston on the same train in the name of Mr. and Mrs. Machado. His traveling companion was subsequently identified as the defendant Leary. This information, together with a description of Machado, was furnished by Amtrak officials to the San Diego agents and was relayed to agents in Boston.

The Boston agents determined that Machado's train was due at approximately 7:50 p. m. on May 10, 1973. While some preliminary investigation was done on May 8, 9 and 10, the agents made no attempt to secure search or arrest warrants. When the train stopped at New Haven on May 10, Amtrak officials verified that the footlocker was still aboard. This information was conveyed to the Boston agents who placed South Station under surveillance.

The train arrived in Boston approximately one hour late. The agents identified Machado from the description that had been provided them. They observed Machado and Leary take possession of an old brown footlocker and two suitcases. A trained detector dog was brought into the station rotunda near where Machado and Leary were waiting. The dog "alerted" to the presence of marijuana in the footlocker which Machado and Leary had claimed.

After claiming the footlocker, Machado was observed making a telephone call. The agents were unable to see the number that was dialed, nor did they overhear any portion of the conversation.

Shortly thereafter, Chadwick entered South Station and went up to Machado and Leary. The three engaged in brief conversation after which they all left the station with a railroad porter who was pushing the footlocker on a baggage cart. Leary entered the passenger side of a Dodge Polara automobile parked outside South Station. Machado and Chadwick assisted the porter in placing the footlocker onto the floor of the automobile's trunk. The automobile engine was not running and the trunk lid was wide open. At this point, approximately 9:15 p. m., federal agents, who were among a number of law enforcement officials staking out the area, placed all three defendants under arrest and took possession of the automobile and the footlocker as well as the personal luggage of defendants Machado and Leary. Subsequent to their arrest, keys and documentation indicating his ownership of the footlocker were found on the defendant Machado. No such evidence was found on the defendant Chadwick.

The defendants were driven to the John F. Kennedy Federal Building (J. F.K.) in government vehicles. A government agent drove the Dodge Polara with the footlocker still in its trunk to J.F.K. Sometime between 9:30 and 11:00 p. m., federal agents opened the footlocker in their J.F.K. offices, and found a large quantity of marijuana. Marijuana was also found in the two suitcases. At no time did the federal agents secure a search warrant.

Arguably incriminating statements were made by the defendant Chadwick subsequent to his arrest, either in the vehicle on the way to J.F.K. or at the

agents' J.F.K. offices.[2] A search of Chadwick's person following his arrival at J.F.K. revealed a small amount of marijuana.

## I. PROBABLE CAUSE TO ARREST CHADWICK

Chadwick claims that his arrest was without probable cause, and this court agrees.

Probable cause to effectuate a warrantless arrest only exists "if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). *Accord,* Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 162, 45 S. Ct. 280, 69 L.Ed. 543 (1925). The circumstances surrounding Chadwick's arrest fall short of meeting this standard.

There is no evidence as to whom Machado called from the South Station. But even if it may be presumed that Machado called to inform Chadwick of his and Leary's arrival, a non-criminal explanation of Chadwick's conduct is at least as likely as one indicating that "an offense has been or is being committed." Brinegar v. United States, 338 U.S. at 176, 69 S.Ct. at 1311.

Simply stated, the non-criminal explanation is that two friends of Chadwick arrived by train from an out-of-town trip. The train was late. They called and asked him to pick them up at the station. He arrived at the station, exchanged pleasantries and assisted the porter in placing their luggage in the open trunk of a car. Then, he was arrested.

There was no evidence that agents had been alerted, during the several days they were awaiting Machado's and Leary's arrival, to the likelihood or even the possibility of a third party accomplice being involved. There was no evidence that Chadwick was recognized as a trafficker by the agents who observed him entering South Station. There was no evidence that the defendant Chadwick knew what was in the trunks, nor can such knowledge be inferred from the record. The most the government can squeeze from these operative facts is that, when arrested, Chadwick was in the presence of two people suspected of criminal activity. His presence at the railroad station and his momentary contact with the footlocker, as he assisted the porter and Machado in placing it in the trunk of the car, are fully explicable in terms of non-criminal conduct and add nothing to the government's case. "Mere presence at the scene of a criminal offense does not support an inference of guilt of that offense." Newsom v. United States, 335 F.2d 237, 239 (5th Cir. 1964). *See, e. g.,* McDonnell v. United States, 472 F.2d 1153, 1156 (8th Cir.), cert. denied 412 U.S. 942, 93 S.Ct. 2785, 37 L.Ed.2d 402 (1973).

The Government concedes, at page three of its memorandum, that to a lay observer the circumstances of Chadwick's involvement might appear innocent, but argues that an experienced agent would recognize them as being significant. According to the Government, an experienced observer could readily detect that Chadwick was being used as a "mule"—a courier for trans-

2. The statements made by Chadwick were part of a conversation that he had with two federal agents. While the agents who accompanied Chadwick to the J.F.K. building testified differently as to where the conversation occurred, they both agreed as to the substance of the conversation. Chadwick said that he had come down from Salem, New Hampshire, to pick up a friend. Then he asked the agent how he knew what was in the trunk. The agent responded that he would ask the questions and asked Chadwick how he knew. Chadwick said that he did not know what was in the trunk. Precisely where the conversation occurred is immaterial for the purposes of this motion to suppress since both agents agreed that it occurred after Chadwick was arrested.

porting drugs. This argument would appear to urge adoption of a subjective standard of probable cause which would require, as a threshold matter, an evaluation by the court of an agent's experience and ability in order to weigh what criminal significance he might have legitimately ascribed to a given set of circumstances. To adopt such a standard would set an unfortunate precedent with the distinct possibility of facially inconsistent results, depending on the impression a particular agent made on a particular judge.

Certainly, as was noted in United States v. Kancso, 252 F.2d 220, 222–223 (2d Cir. 1958), government agents, in their efforts to protect the public, must depend on a variety of resources, including their own knowledge and expertise. This is why undercover efforts are permitted, and the law with respect to entrapment is geared to protect unwary innocents as opposed to unwary criminals. It is quite another matter to say, in effect, that probable cause is in the eyes of the beholder; that the results of a probable cause hearing could vary depending on whether the key witness happened to be a government agent as opposed to a private citizen. It would be impossible to rationalize such an approach with a concept so fundamental to fair trials; *i. e.*, that, subject to exceptions not here material, the weight and credibility of all testimony is to be judged by the same standards.

■ We do not handcuff our government agents by requiring that they arrest only when the facts upon which they wish to rely would warrant *a man of reasonable caution*—as opposed to one of extraordinary sophistication—in concluding criminal activity was taking place. They are merely required to meet a standard that can be understood by the average reasonably prudent person.

■ The Supreme Court has consistently rejected any attempt to dilute the probable cause safeguard. Neither mere suspicion nor subjective good faith can substitute for objective, probable cause as a basis for arrest.

> Anything less [than probable cause] would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) *citing* Beck v. Ohio, 379 U.S. 89, 96–97, 85 S. Ct. 223, 13 L.Ed.2d 142 (1964); Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

■ The Government's effort to justify the arrest on the grounds that Chadwick was at least in constructive possession of the footlocker and, therefore, is presumed to know of its contents must also fail. There is no evidence sufficient to warrant a finding that, at the time of arrest, Chadwick had exercised any dominion or control over the subject footlocker. His contact with the footlocker in the South Station was less than that of the porter. His assisting the porter and Machado in placing the footlocker in the trunk was not an exercise of dominion and control. Indeed, the fact that the footlocker had been placed on the floor of the car's trunk did not transform Chadwick's role or status into a possessory one. As a matter of fact, the agents had no information prior to Chadwick's arrest that he owned or had rented the Dodge Polara, or that he was the one who drove it to South Station. On the facts available, Chadwick was no different from thousands of others who pick up passengers at various terminals and yet cannot be deemed to have dominion or control of their baggage. The evidence being insufficient to warrant a finding of possession, there can be no permissible inference of knowledge with respect to the contents of the footlocker.

■ Even assuming, however, that somehow at least a joint constructive

possession on the part of Chadwick could be presumed, the facts do not warrant a presumption of knowledge as to the footlocker contents.

■ In Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), which dealt with a statutory presumption of knowledge, the Court established that such a presumption is unconstitutional "unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." *Id.* 395 U.S. at 36, 89 S.Ct. at 1548. This standard is also applicable to common law inferences such as an inference of guilty knowledge from the fact of unexplained possession of stolen goods. *See* Barnes v. United States, 412 U.S. 837, 845 n. 8, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973). Thus, there can be no automatic inference from Chadwick's momentary joint possession of the footlocker trunk that he knew the trunk contained marijuana.

None of the cases cited by the Government adequately support its position that knowledge of the contents can automatically be inferred from momentary possession. Primary reliance is placed on People v. Nettles, 23 Ill.2d 306, 178 N.E.2d 361 (1961), cert. denied, 369 U.S. 853, 82 S.Ct. 939, 8 L.Ed.2d 12 (1962). That case dealt with possession of narcotics that were found in the apartment in which the defendant was living, a factual situation clearly distinguishable from the operative circumstances of this case.

State v. Funk, 490 S.W.2d 354 (Mo. Ct.App.1973), also cited by the Government, stands for the proposition that one in exclusive control of a dwelling may be deemed to knowingly possess what is contained therein. That court drew a major distinction, however, between exclusive and joint control and concluded that where control was joint, some further evidence must be adduced

connecting the defendant with the drug. *Id.* 490 S.W.2d at 361. *Accord,* United States v. Bonham, 477 F.2d 1137 (3rd Cir. 1973). In this case, there was no such evidence tying Chadwick to the footlocker or its contents.

The Government also cited People v. Reisman, 29 N.Y.2d 278, 327 N.Y.S.2d 342, 277 N.E.2d 396 (1971), in support of its position. There the evidence showed that the defendant claimed two packages of marijuana addressed to him at Kennedy Airport. While it may well be valid to infer that a person knows the contents of a package addressed to him, such a proposition has no application to the facts of this case. The destination address of the footlocker was Machado's, not Chadwick's. The trunk was claimed by Machado, not Chadwick. Even the dicta of *Reisman* indicating that one may be presumed to know the contents of his automobile is of no assistance to the Government, there being no evidence prior to his arrest that Chadwick owned, drove or leased the Dodge Polara.[3]

■ Judged against the standards established by the Supreme Court in Barnes v. United States, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); and Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), this court must conclude that the Government has not sustained its burden of demonstrating that the presumed fact—knowledge—follows more likely than not from the proved fact—momentary, joint possession. Chadwick's conduct is wholly explicable as non-criminal conduct and the Government has adduced no additional evidence linking him with the footlocker containing marijuana.

■ There having been insufficient cause to justify Chadwick's arrest, his subsequent statements and all evidence seized during the post-arrest search of

3. The ancillary issue as to whether or not, under the circumstances, the footlocker was part of the "contents" of the automobile at the time of arrest is discussed in part III *infra.*

his person is suppressed.[4] Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## II. PROBABLE CAUSE TO ARREST LEARY

Defendant Leary has claimed that the agents also lacked probable cause to arrest her. This court disagrees and holds that the facts and circumstances surrounding her arrest were sufficient in themselves to warrant a man of reasonable caution in the belief that she was committing an offense. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

At the time of her arrest, the agents reasonably believed that she was the wife of the defendant Machado. The tickets for the cross-country train trip were in the name of Mr. and Mrs. Machado. They were seen together in San Diego prior to the departure of the train. They arrived together at South Station; claimed the luggage together and were standing together when Chadwick entered South Station. When they left the station, she immediately entered the automobile while her "husband" and Chadwick assisted the porter in placing their luggage in the trunk.

Having redeemed their luggage together, Machado and Leary had joint possession and control of the footlocker trunk. The agents had probable cause to believe that it contained marijuana. The agents had probable cause to believe that the "wife" knew the contents of the baggage that accompanied her and her husband across the country. Indeed it strains credulity to suggest that a spouse would not know the contents of such a significant piece of luggage. That Leary was not the wife of Machado and that, in fact, she may not have known the contents of the footlocker is immaterial to a finding that the agents had reasonable cause to believe the contrary. Accordingly, this court finds that there was probable cause to arrest the defendant Leary.

## III. THE WARRANTLESS SEARCH OF THE FOOTLOCKER

While the defendants, Chadwick and Leary, have disclaimed ownership of any of the luggage seized, they have standing to challenge the search. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), gives a defendant standing to object to a search when charged with a crime wherein possession of the article is itself an essential element.

It is conceded that the footlocker was searched without a warrant. Warrantless searches are per se unreasonable, subject to a few carefully delineated and limited exceptions. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The search, therefore, can be justified only if it meets the requirements of some exception to the warrant requirement.[5]

The Government seeks to justify this search as an automobile exception, see Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), contending that the facts of this case are controlled by United States v. Soriano, 497 F.2d 147 (5th Cir. 1974) (en banc).

4. Chadwick's alternate basis for suppressing his post-arrest statements—lack of *Miranda* warnings—was not supportable on the basis of the evidence presented at the hearing. The credible testimony disclosed that the *Miranda* warnings were read to both Chadwick and Machado by a railroad police officer who accompanied them to J.F.K. The federal agent who drove the vehicle then went over each of the rights and asked the defendants whether they understood each facet of their *Miranda* rights. Both defendants indicated that they understood their rights. This occurred prior to the conversation recited in note 1 *supra*. Hearing Transcript 31–35.

5. The recognized exceptions to the warrant requirement are (1) hot pursuit; (2) plain view doctrine; (3) emergency situation; (4) automobile search; (5) consent; and (6) incident to arrest. United States v. Mapp, 476 F.2d 67, 76 (2d Cir. 1973).

In *Soriano,* the evidence showed that federal law enforcement officials followed a taxi occupied by three people whom the agents had probable cause to believe were transporting heroin. Upon arrival at the Miami International Airport, the agents arrested the occupants of the cab, and removed three suitcases from that vehicle. The agents peeked into one of the suitcases at the place of arrest; the other two were searched at a place other than that of arrest. The district court suppressed the heroin found in all three suitcases. The court of appeals affirmed. Reversing both the district court and the court of appeals panel, the Fifth Circuit Court of Appeals, sitting en banc, sustained the search on the rationale of Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

*Chambers* involved a warrantless automobile search at the police station following a late night arrest of the four defendants who were in their automobile parked in a dark parking lot. In upholding the delayed search, the Court held that a lawful search could have taken place on the spot because the automobile was readily movable and the opportunity to search was fleeting. The Court then reasoned that a warrantless seizure is arguably as intrusive of protected Fourth Amendment rights as a warrantless search. Noting that, for constitutional purposes, there was little to choose between a warrantless search and a warrantless seizure pending receipt of a search warrant from a magistrate, the court concluded, in the context of that case, that "[g]iven probable cause to search, either course is reasonable under the Fourth Amendment." 399 U.S. at 52, 90 S.Ct. at 1981. The delayed search was treated as if the initial exigency validating the warrantless seizure had continued.

*Chambers* was based on Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court case that first articulated the automobile exception to the warrant re-

quirement. The search in *Carroll* occurred on the open highway after police officers had stopped a speeding vehicle suspected of containing contraband liquor.

While the exact parameters of the automobile exception have not been determined, it is important to note at the outset out "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." Coolidge v. New Hampshire, 403 U.S. 443, 461–462, 91 S.Ct. 2022, 2035, 29 L. Ed.2d 564 (1971) (Stewart, J.).

In all of the so-called automobile exception cases there was a nexus between the search and the automobile; a danger that if the warrantless search were not permitted, contraband might well disappear. In this case, there was no nexus between the search and the automobile, merely a coincidence. The challenged search in this case was one of a footlocker, not an automobile. The search took place not in an automobile, but in J.F.K. The only connection that the automobile had to this search was that, prior to its seizure, the footlocker was placed on the floor of the automobile's open trunk.

Unlike the situation in *Soriano,* the footlocker had not been transported in the automobile. It was being delivered from and not to a public transportation terminal. From the time that the defendants approached the automobile until they were arrested and in custody, the trunk lid of the automobile was never closed. The footlocker remained in plain view at all times. The motor of the car was not running. No one was in the driver's seat behind the wheel. Under these circumstances, the floor of the automobile trunk was nothing more than a platform or resting place for the footlocker.

Arguably, the Boston agents had probable cause to arrest Machado and Leary when they claimed the footlocker at South Station. Even if they did not have probable cause at that instant, they clearly had probable cause after the de-

tector dog had alerted to the presence of marijuana in the footlocker trunk. Had the arrest taken place in the station area, a warrant would have been required before the footlocker could have been permissibly searched. Had the arrest taken place while the footlocker trunk was on the porter's trolley, a warrant would have been required. *See* United States v. Garay, 477 F.2d 1306, 1308 (5th Cir. 1973); United States v. Anderson, 500 F.2d 1311 (5th Cir. 1974). To hold that merely placing the footlocker onto the floor of the trunk of an automobile, parked with its motor off and its driver's seat empty, invokes the automobile exception would be to trigger consideration of the automobile exception anytime an automobile was even remotely in the picture.

But even assuming the facts of this case warrant consideration of the automobile exception, the rationale under which we validate searches of automobiles without a warrant is of no help to the Government here. The concept of a vehicle containing contraband liquor fleeing on the highway in the night is very remote from the situation in this case. *See* Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The various extensions of *Carroll* have all been justified on the presence of some exigency, a realistic danger that evidence would disappear unless a warrantless search were permitted. In *Chambers,* the Court extended the rule by allowing the officers to defer the search of the automobile until it was taken to the stationhouse. In *Soriano,* the court allowed the luggage that was seized from a taxicab in which the defendants arrived at an airport to be searched in part at the airport and later in full at the stationhouse.

However great or slight the exigencies might have been in those cases, none of them are present here. The automobile was not moving. There were no known or suspected accomplices in the area. In fact, the agents had deferred the arrest until the defendants were outside the station precisely to determine whether there were other individuals involved. The defendants were arrested, handcuffed and placed immediately into government vehicles. There were numerous officers present, including city policemen, railroad guards and federal agents. The arrest took place within 10 blocks of the federal courthouse past which the agents traveled on their way to J.F.K. where the actual search took place. The footlocker was locked with two different locks and, immediately after the arrest of the defendant, the keys that opened the locks were obtained by federal agents. The footlocker, which weighed two hundred pounds, was not in imminent or even potential danger of being destroyed or spirited away.

In brief, no exigency that would justify a warrantless search on the grounds of an automobile exception to the warrant requirement of the Fourth Amendment can be found on the facts of this case. To rule otherwise would be to establish a per se rule permitting a warrantless search any time an automobile was even remotely involved in an arrest. While such a rule might be convenient for law enforcement officers, as well as for courts which are required to decipher and distinguish the many precedents in this troublesome area, it would be an unnecessary and undesirable dilution of existing Fourth Amendment safeguards.

The Government has placed exclusive reliance on the automobile exception as a basis for validating this warrantless search. That argument has been rejected. The court has examined the other exceptions to the warrant requirement and finds that none of them are applicable to the facts of this case. There being no justification for the warrantless search of the footlocker trunk and suitcases, all evidence obtained therefrom is hereby ordered suppressed.

## SUPPLEMENTAL OPINION

On January 13, 1975, an opinion and order was entered granting the defend-

ants' motion to suppress. On February 7, 1975, the Government filed motions to reconsider and to vacate.[1] The motion for reconsideration was granted and a hearing held on the motion to vacate.

In support of its motion to vacate, the Government introduced additional evidence with respect to the search of the suitcases and also offered an additional theory to support the footlocker search. Although none of this evidence was inconsistent with the court's previous findings of fact, it did provide more detail concerning the search of the two suitcases. The court makes the following supplemental findings of fact, but incorporates by reference the findings and conclusions made in its original opinion dated January 13, 1975.

## SUPPLEMENTAL FINDINGS OF FACT

As the three defendants departed the South Station terminal, the defendant Leary was carrying one of the two Tourister suitcases (see January 13, 1975 opinion at p. 767) which she placed in the passenger compartment of the automobile. The other suitcase was placed in the automobile trunk with the footlocker. Neither suitcase was opened or removed from the vehicle before the federal agents drove the automobile to J.F.K.

At their J.F.K. offices, the agents opened the footlocker first, using the keys that had been found on the defendant Machado. It was at this time that the marijuana was first seen in the footlocker. (See January 13, 1975 opinion at pp. 767–768).

After having opened the footlocker, the agents then sought to open the two suitcases, ostensibly for the purpose of inventorying their contents. Both suitcases were locked. The agents opened both suitcases by picking their locks. Marijuana was found in both suitcases. Permission to open the suitcases was not sought or obtained from any of the defendants and the agents made no effort to secure a search warrant. Although the Government claims that the purpose for searching these suitcases was to inventory the items contained therein, no inventory list was introduced into evidence. Moreover, there was no evidence that an inventory list was prepared and given to the defendants. The Government represented that the inventory search was conducted pursuant to a procedure specified in the Agents Manual.[2]

## I

### THE FOOTLOCKER SEARCH

The Government's original opposition to defendant's motion to suppress the fruits of the footlocker search was based exclusively on the "automobile exception" to the search warrant requirement. (See January 13, 1975 opinion at pp. 767–768). The Government now asserts that this search should be justified as one incident to arrest. Its theory is that had the search taken place

---

1. The Government filed a notice of appeal on February 10, 1975. By an order dated February 25, 1975, the Court of Appeals granted leave to the district court to entertain and act on the Government's Motion for Reconsideration. While retaining appellate jurisdiction of the case, the Court of Appeals stayed further prosecution of the appeal pending the action of this court on the Government's motion.

2. Agents Manual, ¶ 6662.25(A)(2). Collection and Handling of Other Personal Property:

Personal property of non-evidentiary value which is found in a seized automobile will be handled as outlined in 6654.23

Agents Manual, ¶ 6654.23 Seizure Procedures:

Upon seizing the vehicle, it must be thoroughly searched. A search performed pursuant to civil seizure need not be contemporaneous with an arrest, and no search warrant is necessary. Remove all articles from the vehicle which are not part of the vehicle itself.

Personal property in the vehicle should be returned to the owner or the person from whom the vehicle was seized, and a receipt obtained.

when the defendants were arrested, it would have been valid,[3] and the mere fact it was delayed does not make it any less valid as an exception to the warrant requirement of the Fourth Amendment. The court disagrees.

In the recent cases of United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) and Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), which dealt with warrantless searches of the person, the Court noted essential differences between a search of a person as contrasted with a search of the area within his control. A key issue to be determined in the latter situation is the scope and meaning of the phrase "area within his control."

An analytical framework for applying that phrase to differing factual settings was given by the Court in Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969):

There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

The vitality of the *Chimel* test has not been affected by *Robinson, Gustafson,* or other subsequent Supreme Court opinions.

■■■■ In arguing that a search of a 200 pound, double-locked footlocker is encompassed in the phrase "area within his immediate control," the Government has cited five cases, Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Buckhanon, 505 F.2d 1079 (8th Cir. 1974); United States v. Maynard, 439 F.2d 1086 (9th Cir. 1971); United States v. Mehciz, 437 F.2d 145 (9th Cir.), cert. denied, 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971); United States v. Lugo-Baez, 412 F.2d 435 (8th Cir. 1969), cert. denied, 397 U.S. 966, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970). In all of these cases, the luggage that was searched was being carried by the defendant at the time of his arrest. It may be that hand-carried luggage is encompassed in the phrase "area within his immediate control." But the footlocker in this case was not hand-carried luggage. It was a double-locked, 200 pound container that had already been placed in the open trunk of an automobile at the time of the arrest. At the time of the arrest, the defendants had been immediately handcuffed and surrounded by numerous federal and local law enforcement officials. To hold under these circumstances that this footlocker was an area "from within which [the defendant] might gain possession of a weapon or destructible evidence" would be to render meaningless the limitations imposed by the Court in *Chimel.* As a matter of fact, practicality and law, this footlocker was simply not within the control of the defendants at the time of arrest.[4]

---

3. Since a lawful arrest is a necessary condition precedent to a search incident to arrest, this argument is not applicable to the defendant Chadwick since his arrest was illegal. *See, e. g.,* Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); January 13, 1975 opinion at pp. 767–771.

4. Since this court has ruled that the search of the footlocker could not be justified as a search incident to arrest had it taken place contemporaneously with the arrest, there is no need to determine whether the delayed search could be justified as "substantially contemporaneous." *Compare* Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964) "[o]nce an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to arrest," *with* United States v. Edwards, 415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974), "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." See Coolidge v. New Hampshire, 403 U.S. 443, 457, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

## II

### THE SEARCH OF THE SUITCASES

 In its memorandum in support of its motion for reconsideration, the Government asserted that "the opening of the suitcase was effected—not as a search for more incriminating evidence —but simply to inventory the contents of the suitcase according to established DEA procedure." Government Memorandum at 3. Because the Government placed exclusive reliance on the inventory search exception, it did not attempt to justify the search of the luggage on the search incident to arrest exception. In any event, the suitcase searches could not be upheld as incident to arrest because there was no showing that, at the time of arrest, the suitcases were within the immediate possession or control of any of the defendants.

 At the time of arrest, both suitcases were locked. One was in the automobile trunk and was as inaccessible as the footlocker. The other was somewhere in the passenger compartment of the automobile. While the defendant Leary was seated on the passenger's side of the front seat, there was no evidence that the suitcase was even within her reach let alone her control. "[T]he burden is on those seeking the exemption [from the warrant requirement] to show the need for it." United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951). That burden has not been sustained.[5]

 The Government's attempts to justify the suitcase searches as "inventory searches" must also fail. This search was not required or authorized by the section of the Agents Manual pursuant to which the Government claims the agents were acting. The rel-

evant portion provides only that "upon seizing the vehicle, it must be thoroughly searched . . . . Personal property in the vehicle should be returned to the owner or the person from whom the vehicle was seized, and a receipt obtained." Agents Manual ¶ 6654.23 (March 19, 1974). This section does not require or even suggest that the agents are authorized to forcibly open a closed, locked suitcase for the purpose of "inventorying" its contents.

 Even assuming the Agents Manual could be construed to have authorized the suitcase searches, such authorization would not validate an otherwise unconstitutional search. An inventory search is, nonetheless, a search within the meaning of the Fourth Amendment. See, e. g., Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); United States v. Lawson, 487 F.2d 468 (8th Cir. 1973); Mozzetti v. Superior Court, 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84 (1971); cf. Terry v. Ohio, 392 U.S. 1, 19, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968). The reasonableness of an inventory search is to be tested against established constitutional principles, and not on the basis of routine administrative practice.

 Inventory searches have been justified for a number of reasons including safeguarding the personal property of the arrestee, insulating the agents from later claims of theft or lost property, as well as institutional safety. None of these considerations is available to justify as inventory searches the breaking into these suitcases. It is simply not credible to suggest that a closed, locked suitcase posed a threat to the institutional safety. The suitcases were securely in the possession of the agents and the defendants were all in custody.[6]

---

5. Even if the suitcase search at a different time and place could be justified as "incident to arrest," it would be difficult to justify that extension to the facts in this case. Both suitcases were locked and no one had the keys to open them. The agents were forced to pick the locks in order to open the

suitcases. Such facts demonstrate rather forcefully that the suitcases were not an area from which an arrestee could readily obtain either a weapon or destructible evidence.

6. Agent Christopher testified that the inventory was not conducted because of concern

No more credible is the theory advanced by the Government that the search was necessary to protect the agents from later claims of theft or lost property. It is difficult to see how the integrity of agents is safeguarded by picking the lock to a suitcase. Such forcible entry would likely invite more, rather than fewer, claims of theft. Breaking open the suitcases (the description used by the agent who testified) was an unreasonable and, therefore, unacceptable approach to the problem.

Other reasonable alternatives, less drastic but at least as effective, were available to the agents. The locked suitcases could have been placed in a locked storage facility, the key to which locker could then have been sealed in an envelope and kept with the other personal property taken from the defendants. Alternatively, the agents could have placed sealing tape over the lock of the suitcase which could have been initialed by the defendants and/or an agent.[7] Either of these procedures would have been reasonable. The Government's approach was not. Since "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible," Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968) (citations omitted), the present search, which went far beyond the permissible limits of an inventory search, cannot be upheld on that rationale.

Both of the cases cited by the Government in support of its inventory search rationale are readily distinguishable. In Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), an incriminating piece of evidence came into plain view when a police officer opened the door of defendant's impounded car for the purpose of closing the windows since it had just started to rain. Since that minimal intrusion to safeguard the car was a legitimate police function, *Harris* is merely an application of the plain view doctrine. Justice Douglas, concurring, noted that this case did not undermine the Court's previous holding in Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L. Ed.2d 777 (1964), where the Court held illegal a full-blown inventory search. In Cooper v. California, 386 U.S. 58, 87 S. Ct. 788, 17 L.Ed.2d 730 (1967), the Court upheld an inventory search of an automobile that was being held subject to forfeiture proceedings. The search occurred one week after the defendant had been arrested and the car impounded. Since "the reason for and nature of the custody may constitutionally justify the search," 386 U.S. at 61, 87 S.Ct. at 791, the Court held that an inventory search pursuant to a forfeiture proceeding was constitutionally permissible.

In this case, there was no claim that the suitcases were being held for forfeiture proceedings. The agents viewed the suitcases as the personal property of the defendants and intended only to "safeguard" their contents pending release of the defendants. Neither *Harris* nor *Cooper* justifies the agent's picking the locks of these suitcases.

### III

### SUPPRESSION OF CHADWICK'S STATEMENT

The Government challenges this court's order suppressing the statements made by the defendant Chadwick shortly after his illegal arrest. (See January 13, 1975 opinion at pp. 770–771). The Government's position is that the agent's recitation of *Miranda* warnings to Chadwick purged his statement of any taint

---

for institutional safety and that the agents did not suspect that the suitcases contained explosives. See Transcript, March 6, 1975 hearing at p. 14.

7. For a discussion of other reasonable alternatives to an inventory search, *see* Mozzetti v. Superior Court, 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84 (1971); Note, The Inventory Search of an Offender Arrested for a Minor Traffic Violation, 53 B.U.L.Rev. 858, 869 (1973).

occasioned by the illegal arrest. This court disagrees.

 The Government has focused on only one of two factors deemed important by the Court in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The threshold question is whether Chadwick's statement was voluntary. The mere recitation of *Miranda* warnings is not a guarantee that the statement made was voluntary. *Miranda* teaches that in-custody interrogation is inherently coercive, even as to one who is lawfully in custody. That coercive element is exacerbated where the initial arrest is illegal.

> It is probable that even today, when there is much less ignorance about these matters than formerly, there is still a general belief that you must answer all questions put to you by a policeman, or at least that it will be the worse for you if you do not.[8]

The second element that led to the suppression of the defendant Toy's statement in *Wong Sun* was the perceived need to impose sanctions on the illegal conduct of the police. The Court held that this could best be achieved by depriving the police of the fruits of their illegal conduct. Only where the statement was made as a result of an "intervening independent act of free will" did the Court uphold the admission of the statement made following an illegal arrest.

Both factors are relevant to this case. Although the defendant had received his *Miranda* warnings in the agents' car shortly before the allegedly incriminating statement was made, he was not requested to execute nor did he execute a waiver of his *Miranda* rights. The Government has the heavy burden of establishing that Chadwick both *voluntarily* and *knowingly* abandoned his right to remain silent. This is particularly so since he was interrogated within a few short minutes after being illegally arrested. The Government has failed to meet this burden.

The court reaffirms its opinion and order of January 13, 1975. The motion to vacate that order is hereby denied

---

8. Devlin, The Criminal Prosecution in England (1958), *as quoted in* Wong Sun v. United States, 371 U.S. 471, 486 n. 12, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).