**Supreme Court**

No. 2013-13-C.A.
(P1/11-179C)

State                    :

    v.                 :

Elizabeth Mendez.      :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Elizabeth Mendez. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson for the Court.**  On April 5, 2012, a Providence County Superior Court jury found the defendant, Elizabeth Mendez, guilty of possession of more than five kilograms of marijuana in violation of G.L. 1956 § 21-28-4.01.2(a)(5).[1]  On May 24, 2012, the trial justice sentenced the defendant to twenty years imprisonment, with five years to serve and the remaining time suspended with probation.

On appeal, defendant contends:  (1) that the trial justice erred in his supplemental jury instruction given in response to a question posed by the jury; (2) that the trial justice erred in denying defendant's motion for a new trial; and (3) that defendant's twenty-year sentence is violative of Article 1, Section 8 of the Rhode Island Constitution.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

---

[1]     The cited statute provides, in pertinent part, as follows:  "Except as authorized by the chapter, it shall be unlawful for any person to possess, manufacture, sell, or deliver the following enumerated quantities of certain controlled substances: * * * (5) More than five kilograms (5 kgs.) of a mixture containing a detectable amount of marijuana[.]"   G.L. 1956 § 21-28-4.01.2(a)(5).

# I

## Facts and Travel

On January 20, 2011, defendant was charged by indictment with one count of possession of more than five kilograms of marijuana in violation of § 21-28-4.01.2(a)(5), (b) (Count 1); one count of conspiracy to possess more than five kilograms of marijuana in violation of § 21-28-4.08 (Count 2); and one count of possession of methylenedioxymethamphetamine (MDMA)[2] in violation of § 21-28-4.01(c)(2)(i) (Count 4).[3] In that same indictment, two co-defendants were similarly charged with possession of more than five kilograms of marijuana and conspiracy to possess more than five kilograms of marijuana.[4] Those co-defendants, Osvaldo German and Jonathan Espinal, were not tried with defendant.[5]

The defendant's criminal trial began in March of 2012, and the evidence presented therein included testimony from Trooper Marc Alboum of the Rhode Island State Police, Officer Diego Mello of the East Providence Police Department, Officer Raymond Reall of the North

---

[2]    Methylenedioxymethamphetamine, more commonly known as ecstasy or MDMA, is a type of psychoactive drug which "produces feelings of increased energy, euphoria, emotional warmth, and distortions in time, perception, and tactile experiences." Vasquez v. Sportsman's Inn, Inc., 57 A.3d 313, 314-15 n. 1 (R.I. 2012) (internal quotation marks omitted).

[3]    We note that defendant was charged only with the counts labeled in the indictment as Counts 1, 2, and 4; she was not charged with Count 3 or Count 5 of the indictment, which pertain to another co-defendant.

[4]    One co-defendant, Osvaldo German, was additionally charged with possession of marijuana in violation of § 21-28-4.01(c)(2)(ii), having previously been convicted of possession with intent to deliver a controlled substance in violation of § 21-28-4.11 (Count 3); and, he was also charged with knowingly providing a license request form containing a false statement intended to mislead in violation of G.L. 1956 § 11-18-1 (Count 5). The other co-defendant, Jonathan Espinal, was only charged with Counts 1 and 2.

[5]    Mr. German pled nolo contendere to all charges brought against him in the indictment, and he testified at defendant's trial that, in exchange, he had received a twenty-year prison sentence, with eight years to serve and the balance suspended. As for Mr. Espinal's case, it is not clear from the record before us whether or not there has been a disposition.

Providence Police Department, co-defendant Osvaldo German, and Jennysa Ayala, a friend of defendant who was present at the apartment of defendant on the night when defendant was later arrested.[6] We summarize below the testimony of those witnesses as it relates to the instant appeal.

**A**

**The State's Case**

**1. The Testimony of Trooper Marc Alboum**

The state began its case with the testimony of Trooper Alboum of the Rhode Island State Police. Trooper Alboum testified that, while he was on patrol in his cruiser on the night of July 26, 2010, he heard a broadcast on his police radio about a carjacking at gunpoint in the city of Providence, specifically at the intersection of Admiral Street and Hawkins Street. Trooper Alboum stated that the broadcast described the carjacking suspects as "two dark-skinned males * * * wearing white T-shirts," and he added that the broadcast described the car as a "light blue Kia minivan." He further testified that he heard in a later broadcast that the carjacked vehicle had been recovered in a Walgreens parking lot. Trooper Alboum testified that he proceeded to that location; he said that, at the Walgreens, there were law enforcement officers from several police departments all "standing around." In his testimony, Trooper Alboum estimated that there were around fifteen to twenty officers in uniform at the scene.

---

[6] We omit from our discussion the testimony of Trooper Ernest Adams, Trooper Luke Shatz, and Trooper Herbert Tilson, as their testimony has no direct bearing on defendant's contentions on appeal. In addition, we reference only where necessary the testimony of two forensic scientists, Paul Breault and Paul Steven Iwuc. The forensic testing undertaken by those scientists, performed in order to identify the substances found in defendant's car, need not be revisited in detail here. The parties do not dispute on appeal that both MDMA and marijuana were discovered in defendant's vehicle, nor do the parties dispute the amounts found therein.

Next, Trooper Alboum testified that, while he was standing in the Walgreens parking lot, he observed a black Nissan Maxima drive past. Trooper Alboum testified that he could see that the driver of the Nissan Maxima was a woman and that in the car there were two male passengers, both dark-skinned and wearing white T-shirts. Trooper Alboum also testified that the driver of the Nissan Maxima was "staring straight ahead" as she passed the Walgreens parking lot and that her two passengers were "slouching down," while also "looking straight ahead." Trooper Alboum further testified that the behavior of the occupants of that car stood out in contrast to what was transpiring in the other cars passing by, in that the occupants of the latter cars were turning their heads in the direction of what Trooper Alboum testified was a "large police presence" in the parking lot.

Trooper Alboum then testified that, after observing the occupants of the Nissan Maxima, he proceeded to "run an inquiry" on the vehicle's license plate and discovered that the license plate affixed to the Nissan Maxima "came back [registered to] a 2000 silver Toyota." Trooper Alboum stated that "the registration [did not] match the vehicle." It was Trooper Alboum's testimony that, after that discovery, he started his cruiser and began to follow the Nissan Maxima. He further testified that he "clock[ed]" it as traveling at 45 miles per hour in a 25 mile per hour zone. Trooper Alboum stated that the Nissan Maxima proceeded to enter Route 146 and that, as it did so, it entered "right behind [another] vehicle, nearly striking it." Trooper Alboum testified that, as he followed the Nissan Maxima onto Route 146, he activated his lights and siren; he added that the Nissan Maxima nonetheless continued without stopping. Trooper Alboum stated that it was only after another police cruiser passed the Nissan Maxima in the high speed lane, positioned itself in front of the vehicle, and slowed down, that the Nissan Maxima slowed and eventually stopped.

- 4 -

Trooper Alboum then testified that, after exiting his cruiser, he approached the Nissan Maxima and that, as he did so, he could smell "the odor of fresh marijuana" emanating from the back of that vehicle. He further testified that he approached the driver's side of the car and asked all of the occupants to "put their hands up;" Trooper Alboum stated that he made this request in order to "see everyone's hands to make sure they didn't have any weapons in their hands * * * ." He testified that, although all of the occupants initially complied, he observed that Mr. Espinal, the passenger seated behind the driver's seat, was "starting to put his hands down."[7] It was Trooper Alboum's testimony that he asked Mr. Espinal to step out of the car, searched him for weapons, and handcuffed him, before finally placing him in the back of the police cruiser.

Trooper Alboum testified that he then returned to the Nissan Maxima and approached the driver's side. It was Trooper Alboum's testimony that, at that point in time, he could detect the odor of burnt marijuana coming from inside the vehicle. He testified that he asked defendant, the driver of the car, for her license and that, when she began to reach toward the floor of the car, he asked her to step out of the car.[8] He said that he made that request because "it's not normal that people reach for their licenses on the floor of the vehicle."

Trooper Alboum further testified that, after defendant stepped out of the car, he "sent her * * * towards the other troopers;" he added that he did not handcuff her himself, because his "set of handcuffs was on Mr. Espinal."[9] Trooper Alboum next testified that he checked under the

---

[7] During his testimony at trial, Trooper Alboum identified the person seated behind the driver as co-defendant Jonathan Espinal.

[8] During Trooper Alboum's in-court testimony, he identified defendant as being the driver of the car on the night of July 26, 2010.

[9] Although Trooper Alboum was not able to testify specifically as to the details of defendant's arrest because he neither arrested defendant personally nor observed another officer effectuating the arrest, it is apparent from the record that the arrest occurred after Trooper

floor mat on the driver's side (where defendant had been sitting) and found a "clear plastic baggy with a half a blue pill" inside.[10] He added that Officer Raymond Reall of the North Providence Police Department searched the other passenger, Mr. German, and in the course of that search found a "plastic bag" containing what appeared to be marijuana.[11] It was Trooper Alboum's testimony that, following that discovery, he embarked on a more thorough search of the car with the assistance of another law enforcement officer—namely, Officer Reall, who had accompanied him in a separate cruiser in the pursuit of the Nissan Maxima onto Route 146.

Trooper Alboum stated that, in the course of the more thorough search, he opened the trunk of the Nissan Maxima and immediately observed "two rectangular objects that had a clearish green plastic baggy on it [sic]." In addition, Trooper Alboum noted that the odor of fresh marijuana "increased * * * significant[ly]" once he had opened the trunk. According to Trooper Alboum's testimony, a complete search of the trunk yielded six such "rectangular objects" (which he described as "bales") covered in "greenish clear cellophane wrap." Later testimony at trial by one of the state's forensic scientists was to the effect that the bales contained marijuana and that the total weight of the marijuana was approximately thirty kilograms.[12]

Trooper Alboum further testified that, on July 27, 2010 (the morning after the arrests of defendant, Mr. German, and Mr. Espinal), Mr. German agreed to make a statement, and he was

Alboum asked defendant to step out of the car and sent her in the direction of the other law enforcement officers at the scene.

[10]     One of the forensic scientists who testified for the state indicated that his testing demonstrated that the blue pill contained MDMA.

[11]     When Officer Reall testified during defendant's trial, he stated that the marijuana was found during a patdown of Mr. German's clothing.

[12]     One kilogram is the equivalent of approximately 2.2 pounds in the system of weights commonly used in this country. See The American Heritage Dictionary of the English Language 966 (5th ed. 2011). Accordingly, the bales referred to in the text weighed approximately sixty-six pounds.

advised of his constitutional rights at that time. The trooper testified that his subsequent discussion with Mr. German lasted approximately twenty to thirty minutes; he added that the discussion was thereafter memorialized in a six-page "formal typed statement" (hereinafter "the unsigned statement"). Trooper Alboum stated that Mr. German initialed each of the first five pages of the unsigned statement, but did not sign it or check a box indicating that the "above statement was true to the best of [his] knowledge." Trooper Alboum further testified that he (Trooper Alboum) thereafter changed the last line of the unsigned statement and that the resulting version of the statement was read and signed by Mr. German (hereinafter "the signed statement"). According to Trooper Alboum's testimony, the two statements were substantively identical, with the exception of the last line.

Trooper Alboum first testified concerning the contents of Mr. German's unsigned statement. He stated that, in the course of his conversation with Mr. German about the events leading to defendant's arrest, Mr. German told him that defendant had come and picked up Mr. Espinal and Mr. German around 6 or 7 p.m. on what would be the night of the arrest. Trooper Alboum then testified that Mr. German said that a friend named Felix had called and told Mr. German that he had marijuana and wanted to know if Mr. German could "get rid of it." Trooper Alboum further testified that Mr. German also told him that Felix then said that he had "something for Ellie"[13] and that Mr. German should "come get it." Trooper Alboum stated that Mr. German then said that defendant, who was in the car with Mr. German and Mr. Espinal, could hear the phone conversation between Mr. German and Felix and that Mr. German subsequently directed defendant to drive to the location where they would meet Felix.

---

[13]     It was Trooper Alboum's testimony that Mr. German "specifically used the word 'Ellie' to refer to the defendant."

- 7 -

It was Trooper Alboum's further testimony that he asked Mr. German why defendant would be the one to "get rid" of the marijuana and that Mr. German replied: "Because she [(Ms. Mendez)] is the one that sells it." Trooper Alboum stated that Mr. German said that defendant was "fully aware" that there was a large amount of marijuana in her car on the night of her arrest. Finally, Trooper Alboum testified that, when he asked Mr. German whether he had anything to add to his first statement, Mr. German stated: "It was not my weed. It was Elizabeth's weed." Trooper Alboum testified that Mr. German refused to sign anything at that point in time.

Finally, Trooper Alboum testified that, after Mr. German opted not to sign the first statement (the unsigned statement), Trooper Alboum prepared another statement (the signed statement) in which he asked Mr. German the same series of questions, and Mr. German replied with exactly the same answers, with one exception. Trooper Alboum explained that, as he finished preparing the signed statement, he again asked Mr. German whether he had anything to add, and Mr. German replied: "The marijuana was all mine, and I am taking the hit for it all." Trooper Alboum stated that, after the just-quoted assertion by Mr. German as to the marijuana being "all his" was added, Mr. German signed the second statement.

### 2. The Testimony of Officer Diego Mello

Officer Diego Mello of the East Providence Police Department also testified for the state. He testified that, on the day of defendant's arrest, he was working as the Vice Unit sergeant in the North Main Street area of Providence and that he responded to a BOLO[14] concerning a "blue Kia minivan" that had been reported as having been carjacked by "two Hispanic males with guns." Officer Mello testified that he heard on the police radio that the carjacking occurred in the Hawkins Street area of Providence and that the minivan was last seen heading towards

---

[14] Officer Mello testified that the acronym "BOLO" stands for "be on the lookout." See also State v. Austin, No. 2013-77, 2015 WL 1954726 at *8 n. 4 (R.I. May 1, 2015).

Branch Avenue. He stated that he responded to that area and "[t]ried to figure out the fastest route out of Providence," which, in his opinion, "would be the route that they [the carjackers] would have taken." Officer Mello testified that he determined that the fastest route would be Charles Street, heading outbound towards North Providence; he stated that he proceeded to drive along that route, eventually discovering the blue Kia minivan parked in the Walgreens parking lot. It was his testimony that, after he located the minivan, he "contacted dispatch" with the vehicle's description, and it was confirmed that the vehicle which he had discovered was the carjacked Kia minivan.

Officer Mello further testified that he stayed at the scene and continued to pay attention to the ambient activity; in particular, he said that he could observe the cars that were passing by and that he "looked in every one." He indicated that it was a "sunny summer day" and that he could see the people inside the passing cars. He also testified that he was "able to see which way the drivers of those [passing] cars were looking[.]" Officer Mello added that there was a "heavy police presence" at the Walgreens parking lot; he specified that there were "about 12 police officers, [and] maybe a half dozen police cars [with] their lights on * * *."

Officer Mello next testified that he observed a Nissan Maxima pass by the parking lot and that he could see its occupants. He noted that the passengers were Hispanic males, matching the description in the BOLO that he had heard earlier. It was Officer Mello's testimony that the occupants of the Nissan Maxima acted in a way that "raised a major red flag" for him; he said that, as the Nissan Maxima approached the Walgreens parking lot, in which there was the above-described "heavy police presence," the occupants "were just fixated straight ahead." Officer Mello elaborated on this observation as follows:

> "Everyone else was looking in our direction wanting to see what
> was going on, just like [when] you pass a car accident, everyone

looks to see what's going on. In this case every single person in the [Nissan Maxima] was just fixated straight ahead. They acted as though we weren't even there."

Officer Mello proceeded to testify that he observed Trooper Alboum and Officer Reall depart to follow the Nissan Maxima, while he stayed at the scene and participated in a search of the Kia minivan.

### 3. The Testimony of Officer Raymond Reall

Officer Raymond Reall of the North Providence Police Department also testified for the state. He stated that, on the night of defendant's arrest, he heard a BOLO concerning a stolen vehicle taken at gunpoint; he added that this information brought him to the Charles Street area in North Providence, where he was joined by Trooper Alboum. Officer Reall further testified that the stolen vehicle was recovered in a Walgreens parking lot and that he was "dispatched" to that location. It was Officer Reall's testimony that, once there, he and Trooper Alboum made "sure there was nobody inside of [the vehicle]." He testified that, as he waited with Trooper Alboum for the arrival of Providence law enforcement, he observed "[q]uite a few" more police officers come to the scene. He stated that "every single car that * * * stop[ped] at the red light [on Charles Street] looked over to see what was going on due to the fact [that] there [were] several police cars and people running around over there." He further testified, however, that he noticed one car whose occupants did the opposite; specifically, he testified as follows:

> "There was a vehicle that was stopped at the red light on Charles Street; and I noticed that there was a person sitting in the passenger seat front [of the vehicle] with a white T-shirt, and there was also a[] Hispanic male in the back with a white T-shirt; and that was the description given from the BOLO from Providence. * * * [T]hey would not look over at the parking lot where the police were."

Officer Reall next testified that, after making that observation, he entered his police cruiser and attempted to catch up to the just-referenced vehicle so that he could stop and question its

occupants. His testimony mirrored that of Trooper Alboum as he recounted the details of his pursuit of the Nissan Maxima and his eventual success at pulling the Nissan Maxima over into the breakdown lane of Route 146.

Officer Reall stated that, once the Nissan Maxima was on Route 146, it continued to travel "at a high rate of speed;" he added that he "went into the left lane * * * passed Trooper Alboum's car, passed the [Nissan] Maxima, and got in front of the [Nissan] Maxima and slowed it down * * *." He said that his cruiser and the Nissan Maxima "veered off into the breakdown lane," eventually coming to a stop. Officer Reall testified that he and Trooper Alboum exited their cruisers to approach the Nissan Maxima. It was Officer Reall's testimony that he approached the Nissan Maxima on the passenger side and told the front-seat passenger and the other occupants of the car to "put their hands on the roof." Officer Reall testified that he later learned that the name of the front-seat passenger was Osvaldo German.

Officer Reall proceeded to testify that he took "the passenger [(Mr. German)] out" of the Nissan Maxima and searched him. He stated that, upon searching Mr. German, he discovered marijuana in Mr. German's front pocket.[15] Officer Reall then testified that, following that discovery, he "released [Mr. German] to the custody of the Rhode Island State Police * * * [because] [t]hey ha[d] jurisdiction." Officer Reall stated at trial that, after releasing Mr. German to the custody of the State Police, he helped the State Police search the Nissan Maxima. He testified that he searched the front passenger area, but did not find anything; he added, however, that he became aware of a "strong odor of marijuana coming from the vehicle," which odor he stated was that of "fresh" marijuana. Officer Reall further testified that, when the trunk of the

---

[15] Subsequent testimony for the state by Paul Steven Iwuc, a forensic scientist with the Department of Health, indicated that the substance discovered in Officer Reall's search of Mr. German was, in fact, marijuana.

Nissan Maxima was opened, the odor of marijuana "increased." Officer Reall concluded his testimony on direct examination by stating that, although he was not present when the contents of the trunk were unloaded, he did observe marijuana inside the trunk as he assisted in the search of the Nissan Maxima.

### 4. The Testimony of Osvaldo German

Mr. German, one of the co-defendants, also testified as a witness for the state. He stated that defendant is the mother of his son, who was about two years old at the time of trial. Mr. German further testified about the events that took place on the night of defendant's arrest—July 26, 2010. Specifically, Mr. German testified that, on that night, he was a passenger in defendant's black Nissan Maxima; he said that they were traveling on Charles Street towards Route 146 and that, when the car reached the highway, he observed "cops behind [them] with the lights on." It was Mr. German's testimony that the Nissan Maxima eventually stopped on Route 146 because they were "getting pulled over." Mr. German stated that law enforcement officers approached the Nissan Maxima "with their guns drawn telling [him and the other occupants of the car] to get out, put [their] hands up." Mr. German further testified that the law enforcement officers "took [them] out of the car" and that he was searched—during which search "a small amount of weed" was discovered. It was Mr. German's testimony that, after that discovery, law enforcement officers "put the cuffs" on him and then put him into a police car.

Mr. German proceeded to testify concerning what took place at the Rhode Island State Police barracks, where he was taken after his arrest. He stated that, on the night of July 26, "there [were] a whole bunch of cops there [at the barracks] that [were] asking me questions;" he added, however, that he "didn't answer them."

Mr. German went on to testify that, on the morning of the next day, July 27, he was brought into a room and was asked "more questions." In particular, when asked whether he recalled speaking with any police officers, Mr. German testified that he thought he remembered speaking to Trooper Alboum, whom he identified sitting at counsel table,[16] as well as another police officer who had been in the courtroom earlier that day.

Mr. German next stated that he did not remember what he and the officer talked about, but he added that he did remember that the officer "was typing" during their discussion. However, Mr. German added that the officer "wasn't typing what I was saying." Mr. German also stated that the officer "was just asking questions." When asked what the officer's questions "dealt with," Mr. German responded: "[F]irst they went from a van, then they went [to] the weed." The prosecutor's questions then turned to the details of "the weed," asking Mr. German: "And the five kilograms of weed, what did the [officer] ask you about it?" In response to that question, Mr. German testified that, when the officer had asked him whether the weed was his, he responded in the affirmative. However, when the prosecutor asked whether claiming the weed as his own was what Mr. German had "first told" the officer, Mr. German testified that he did not know what he first told the officer.

At that point in his testimony, after stating that he was not sure what he "first told" the officer, Mr. German recounted his version of events with respect to the unsigned and signed statements. Specifically, Mr. German stated:

> "[W]hen I first talked to [the officer], he went and print out [sic] a
> paper, and when he brung the paper back, it was not what I had

---

[16]    It will be recalled that Trooper Alboum testified that he interviewed Mr. German on July 27. In addition, Mr. German stated that he thought he remembered talking to Trooper Alboum. Accordingly, it can fairly be inferred that the "police officer" with whom Mr. German recalled conversing at the barracks was Trooper Alboum.

told him. And I told him I take full responsibility for everything, that the weed was all mine; and I didn't talk to him after that."[17]

Yet when asked by the prosecutor about the second statement (the signed statement), which contained the above-referenced assertion by Mr. German that "the weed was all [his]," Mr. German testified that he did not remember what he (Mr. German) was talking about at that time. In addition, when asked by the prosecutor: "[I]s that exactly what you said, 'The weed's all mine'?" Mr. German responded: "I don't remember what I said." Mr. German's testimony continued in that vein, with Mr. German frequently answering "I don't remember" to questions with respect to his discussion with the officer and with respect to the unsigned and signed statements.

Mr. German was then given the opportunity to review his signed statement, and he thereafter stated that he remembered "saying that the marijuana's all [his] and [he'll] take full responsibility for everything," but that he "didn't say [he'll] take the hit for it all." In Mr. German's testimony, he characterized the difference between what he said and what was reflected in the signed statement as "the same issue with the other paper [the unsigned statement], why [he] didn't sign; because [the officer] was typing, [Mr. German would] say one thing, [and the officer would] put another."

With respect to the events of the night of defendant's arrest, Mr. German testified that it was he who put the marijuana in the car and that, as far as he knew, defendant "didn't know anything about it." In addition, when engaged in a colloquy with the prosecutor concerning the details of his plea agreement, Mr. German indicated that he had believed at the time that he entered into the agreement that Ms. Mendez "was out of the indictment;" he said that he "would

---

[17]    It is readily apparent from Mr. German's testimony that his reference to "the paper" is meant to refer to the unsigned statement; Trooper Alboum testified that it was the first document that he drafted during their discussion, which document Mr. German did not sign.

have signed [the plea agreement] as long as the charges [were] dropped against her." The following exchange between the prosecutor and Mr. German is in the same vein:

> "Q    What was most important to you, you would have signed anything as long as the defendant, her name wasn't brought into it?
>
> "A    Yes, cause she had nothing to do with it."

In sum, Mr. German's testimony at trial indicated that he remembered very little about the conversations that resulted in the unsigned and signed statements and that the only thing he remembered was stating that he would take "full responsibility" for the marijuana.

**B**

**The Defendant's Case**

Following the conclusion of the state's case in chief, defense counsel moved, pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure, for a judgment of acquittal, in light of what defense counsel characterized as the "inconsistent testimony" proffered by the state. The state objected to the motion, citing an array of evidence presented during the state's case in chief that provided "ample evidence" of Ms. Mendez's "possession," including testimony regarding the odor of marijuana emanating from her car and the unsigned statement made by Mr. German that had been brought out during the testimony of Trooper Alboum. After hearing from both parties, the trial justice denied the motion for judgment of acquittal.

The defense then put on its case. Jennysa Ayala was the sole witness for the defense. It was her testimony that she was with defendant at an apartment at 99 Rugby Street in Providence "all day" on the day of defendant's arrest. Ms. Ayala did testify, however, that defendant left the Rugby Street apartment that evening and did not return at all thereafter. She stated that, "a little bit before 8 o'clock at night," defendant had been preparing a meal when she received a phone

call and then left the apartment, leaving her three-month-old son in Ms. Ayala's care for the evening. Following Ms. Ayala's testimony, the defense rested.

## C

## The Jury Instructions

On April 4, 2012, after closing arguments were delivered by both sides, the trial justice instructed the jury. Those instructions included the following language relative to the crime of possession of a controlled substance:

> "In order to prove that first element of the offense, the State must show that the defendant possessed the controlled substance in question. The law recognizes two different types of possession, actual and constructive. A person has actual possession of something if he or she has direct physical control over it with knowledge of its nature. A person has constructive possession of something if she or he does not have physical control over it but knowingly has both the power and the intent at a given time to exercise dominion and control over it either by himself, herself, or through another person.
>
> "The mere presence near something or mere knowledge of its location by itself is not enough to prove the possession of something. The State must persuade you that the defendant knew the nature of what she possessed; and in this regard the very possession of an item may give rise to the inference that the person who possesses the item knows the nature of what he or she possesses. Although you are permitted to draw that inference, you're not required to do so. As always, you decide what weight to assign the evidence that you've already heard and seen, and what inferences, if any, that you choose to draw from the evidence.
>
> "* * *
>
> "To establish the second element of this offense, the State must show that the possession was knowing and intentional. The person acts knowingly when he or she acts deliberately and purposefully, and not because of a mistake, accident, or any other innocent reason. In order to determine whether knowledge has been established, you may consider, among other things, where the defendant was in relation to where the drugs were found; and the amount of drugs that were found."

- 16 -

Defense counsel raised no objection to the portion of the instructions quoted above nor to any other aspect of the jury instructions given during that initial charge to the jury.

After having been instructed, the jury deliberated for approximately two hours and then submitted the following question to the court: "'Is the operator of a motor vehicle responsible and/or accountable for all of the contents of that vehicle?'"[18] Before answering the jury question, the trial justice met with counsel and proposed the following supplemental instruction:

> "'You need to consider the Court's instructions, find the facts, accord to those the weight you deem appropriate, apply the law to those facts set forth in the instructions.'"

Defense counsel objected to the proposed supplemental instruction, arguing that the trial justice should read to the jury only the first seven words thereof, without going any further—such that the instruction would read as follows: "You need to consider the Court's instructions." The trial justice considered defense counsel's objection, but ultimately rejected it; and he proceeded to give the supplemental instruction as he had originally proposed. The jury then returned to its deliberations.

The next morning, April 5, before the jury reconvened, defense counsel requested that the trial justice give an alternative instruction in response to the jury's question; counsel contended that his newly minted alternative instruction was preferable to the supplemental instruction that had been given by the trial justice the previous day. Specifically, defense counsel requested that the jury be instructed as follows:

> "'The State may not rely upon a defendant's ownership and control of a vehicle to prove that the defendant knew that she possessed marijuana. While these are factors you may consider, the State must prove that there is other evidence indicating the defendant's guilty knowledge of marijuana hidden in the vehicle.'"

---

[18] The quoted question was the second that the jury posed to the trial justice. The first question asked by the jury during its deliberations is not at issue in the instant appeal.

The state objected, pointing to the fact that defense counsel had previously had the opportunity to review the court's jury instructions and the fact that the supplemental instruction simply referred back to the original jury instructions, which were not objected to. The trial justice declined defense counsel's alternative instruction, and the jury continued its deliberations.

## D

## The Verdict and Sentencing

Later on April 5, the same day that defense counsel had requested that the trial justice give the alternative instruction, the jury returned its verdict. The defendant was found guilty on the possession of marijuana charge (Count 1) and not guilty on the charges of conspiracy to possess marijuana (Count 2) and possession of MDMA (Count 4). Subsequently, the trial justice sentenced Ms. Mendez to twenty years of imprisonment, with five years to serve and fifteen years suspended with probation.

## E

## The Motion for a New Trial

On April 13, 2012, defendant moved for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. In her written submission to the trial court, she contended as follows:

> "1. Defendant was denied a fair and impartial trial because the Court erred in charging the jury and in refusing to charge the jury as requested.
> "2. This Court erred in denying the defense motion for a directed verdict of acquittal and the conviction is based on insufficient evidence of guilt in violation of defendant's due process rights;
> "3. The verdict is contrary to law; and/or
> "4. The verdict is contrary to the weight of the evidence and fails to do substantial justice."

At the hearing on the motion, defense counsel focused on the supplemental instruction that the trial justice gave in response to the jury's question, stating that the motion for a new trial was brought "first and foremost * * * over the concern with regard to the jury instruction." Defense counsel contended, inter alia, that the jury "may have been somewhat confused" with respect to the supplemental instruction given in response to the question concerning possession. Counsel pointed to the fact that the jury convicted defendant of possessing over five kilograms of marijuana while acquitting her of conspiracy to commit the same crime. He argued that, if the jury believed the evidence that was consistent with finding defendant guilty of the underlying crime of possession, it would not have been possible for the jury to simultaneously acquit her of conspiracy to commit that crime. Defense counsel contended that the court's supplemental instruction caused the jury to think that "as long as drugs were in [defendant's] car or found in that car, that's it," meaning that the jury would be required to find defendant guilty of the possession charge in spite of their findings with respect to the conspiracy charge. In addition, defendant argued that this Court's decision in State v. Berroa, 6 A.3d 1095 (R.I. 2010), was authority for the proposition that the alternative instruction proposed by defendant was in fact the correct statement of the law as it related to possession (and presumably would have dispelled the jury's confusion). In the end, however, the trial justice denied the motion for a new trial. We shall in due course describe more fully the reasoning which underlay that denial.

## II

### Analysis

On appeal, defendant contends: (1) that the trial justice erred in failing to provide the alternative instruction, which defendant contends would have been the "correct" supplemental instruction (as opposed to the supplemental instruction that was actually given); (2) that the trial

justice erred in denying defendant's motion for a new trial; and (3) that defendant's twenty-year sentence is violative of Article 1, Section 8 of the Rhode Island Constitution. We shall address those arguments in the same order, referencing the applicable standard of review where necessary.

## A

### The Supplemental Jury Instruction

The defendant first argues on appeal that the trial justice erred in declining to give the alternative instruction that defendant proposed on the morning of April 5. The state responds that the trial justice did not err in this regard because a jury is presumed to understand instructions as given; the state further contends that, in view of the fact that the jury did not seek further clarification after having heard the trial justice's supplemental instruction, the jury should be presumed to have understood. For the reasons set forth below, we hold that defendant has waived any argument which she may have had relative to the trial justice's declining to give the alternative instruction because that argument was not raised in a timely manner before the trial justice.[19]

---

[19] While defense counsel did lodge an objection to the trial justice's proposed supplemental instruction on April 4 (the day on which the trial justice gave the supplemental instruction), he did so on grounds that are utterly different from those reflected in the alternative instruction that, on the following day, he argued was appropriate.

The transcript reveals that, on April 4, after the trial justice shared with counsel his proposed supplemental instruction in response to the jury question, defense counsel lodged an objection to "anything beyond" the first seven words of the instruction (i.e., anything beyond this directive to the jury: "'You need to consider the Court's instructions.'") When the trial justice asked what defense counsel found "prejudicial" in the remaining portion of the trial justice's proposed supplemental instruction, defense counsel responded as follows:

> "What I think is prejudicial, your Honor, is that they might forget to consider the elements of the charges with that specific instruction. If they just find the facts, associate some type of weight with them, and then apply the law, I know that they're

We have long abided by the principle that we may not "consider[] at the appellate level issues not properly presented before the trial court." State v. Merida, 960 A.2d 228, 236 (R.I. 2008); see also State v. Clements, 83 A.3d 553, 564 (R.I. 2014); State v. Gomes, 881 A.2d 97, 113 (R.I. 2005). That principle, commonly referred to as the raise or waive rule,[20] is a "well-

suppose[d] to apply the elements, but without that specifically being instructed to them, I think that a step in that process, so to speak, may not take place and they may forget to actually -- the specific elements have to be analyzed as well."

The trial justice proceeded to give a thoughtful and considered response to defense counsel's concern, and further cited his own concern that referencing the elements specifically may result in "cut[ting] out a great deal of the 26 pages of text" that comprised the jury instructions. The trial justice referred back to his earlier admonishment to the jury during his initial instructions: that the jurors ought to "consider the instructions in their entirety" and not to single out any one instruction. Following the above statements, the trial justice added that he would send "an additional six copies" of the jury instructions up to the jury deliberation room, in addition to the six copies which had been previously sent up to the jury.

We recount the above exchange between defense counsel and the trial justice to illustrate that defense counsel's objection was clearly on different grounds from those raised before this Court in the instant appeal.

Furthermore, to the extent that defendant argues before us that her April 4 objection on the above-referenced grounds—namely, that the trial justice erroneously gave the entire supplemental instruction, rather than just the seven words thereof as requested by defendant in her initial objection—we deem that argument to be waived. See Wilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n. 1 (R.I. 2002). Although defendant alludes to the issue in her briefing before this Court, she makes no meaningful argument with respect to whether the trial justice erred in giving the entire supplemental instruction; instead, she limits herself to advocating for the alternative instruction, which she proposed on the morning of April 5. Our precedent requires more than an allusion to an issue for it to become the proper subject of appellate review. See id. ("Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue."); see also Hines Road, LLC v. Hall, 113 A.3d 924, 931 n. 6 (R.I. 2015); State v. Day, 925 A.2d 962, 974 n. 19 (R.I. 2007).

Finally, we note that we consider the alternative instruction later proposed by defendant to act as a further objection to the supplemental instruction, see Perry v. Alessi, 890 A.2d 463, 470 (R.I. 2006) ("He then objected to the trial justice's failure to give eleven of his proposed instructions * * *."); Butera v. Boucher, 798 A.2d 340, 348 (R.I. 2002), and it is this latter objection that we address more fully in our analysis of defendant's arguments on appeal.

[20] Our cases have recognized a narrow exception to this Court's raise or waive rule. For that exception to be applicable, however, "the alleged error must be more than harmless, and the

- 21 -

established maxim," Thornley v. Community College of Rhode Island, 107 A.3d 296, 302 (R.I. 2014), and it "imposes upon litigants a <u>duty</u> to raise all their claims for relief in the trial court and properly articulate them to a judge for a ruling." D'Alessio v. State, 101 A.3d 1270, 1278 (R.I. 2014) (emphasis added).

With respect to objections to jury instructions in particular, this Court has "consistently been exacting about applying the raise or waive rule." Ferris Avenue Realty, LLC v. Huhtamaki, Inc., 110 A.3d 267, 285 (R.I. 2015); see also King v. Huntress, Inc., 94 A.3d 467, 483 (R.I. 2014) (describing this Court as being "especially rigorous in the application of the [raise or waive] rule when considering objections to jury instructions") (internal quotation marks omitted); State v. Crow, 871 A.2d 930, 935 (R.I. 2005) ("[I]f an objection to a jury instruction is not effectively raised below, it is waived on appeal.").

In addition, our law is demanding as to <u>when</u> an objection to a jury instruction should be made: pursuant to Rule 30 of the Superior Court Rules of Criminal Procedure, "[n]o party may assign as error any portion of the charge or omission therefrom unless the party objects thereto <u>before the jury retires to consider its verdict</u>, stating distinctly the matter to which the party objects and the grounds of the party's objection." (Emphasis added.) Accordingly, we have emphasized that "[c]ounsel's objection to the jury instruction must be made <u>before the jury retires</u> because once alerted to the perceived error in the instruction that has been given, the trial justice has an opportunity to cure the alleged deficiencies before the jury retires for

exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." State v. Breen, 767 A.2d 50, 57 (R.I. 2001); see also State v. Figuereo, 31 A.3d 1283, 1289 n. 7 (R.I. 2011); State v. Texter, 896 A.2d 40, 43 (R.I. 2006); see generally Pollard v. Acer Group, 870 A.2d 429, 432, 433 (R.I. 2005). To the extent that defendant seeks an appeal on such constitutional grounds, we perceive absolutely no basis for concluding that this narrow exception could properly be invoked in this case.

deliberations." State v. Viveiros, 45 A.3d 1232, 1243-44 (R.I. 2012) (emphasis added) (internal quotation marks omitted); see also State v. Palmer, 962 A.2d 758, 766 (R.I. 2009); cf. DiFranco v. Klein, 657 A.2d 145, 147 (R.I. 1995) (discussing parallel rule of civil procedure and describing the rationale for the rule as "allow[ing] the trial justice an opportunity to make any necessary corrections to his or her instructions before the jury begins its deliberations") (emphasis added). We note that the foregoing principles are equally applicable in the context of a trial justice giving a jury a supplemental instruction as distinguished from the initial charge to the jury. See, e.g., State v. Vega, 789 A.2d 896, 898 (R.I. 2002) ("After giving both of these supplemental instructions, the trial justice asked the attorneys whether they had any objections to these charges. Both counsel replied in the negative and they also failed to suggest any different or supplemental instructions. * * * [B]y failing to object at trial to the above-referenced instructions, [the] defendant has failed to preserve any alleged inadequacies or errors relating to these supplemental instructions and he is precluded from raising such arguments for the first time on appeal."). We now turn to the instances in which defendant claims that she has properly preserved her objections.

The defendant first asserts that the alternative instruction was correct and that the jury deserved to have it presented to them; in addition, she contends that it "was preserved for direct appeal by [defense] counsel's timely objection," in the form of the alternative instruction. Specifically, defendant contends that defense counsel "objected and requested the correct jury instruction shortly after the trial justice answered [the jury question]." (Emphasis added.) However, the record clearly reveals that contention to be entirely without any foundation in fact. First, and significantly, defense counsel did not contemporaneously object to the supplemental instruction on the grounds that are now presented in his brief to this Court—namely, in the form

- 23 -

of the alternative instruction. In our view, it is inaccurate for defendant to claim that his proposed alternative instruction was brought to the trial justice's attention "shortly" after the trial justice gave his own supplemental instruction in response to the jury question. Significantly, after the trial justice gave his supplemental instruction, the jury resumed its deliberations; and it was only the next morning that counsel requested the alternative instruction. We note that our precedent emphasizes that "it is imperative that a focused objection specific enough to alert the trial justice as to the nature of [the trial justice's] alleged error in giving any jury instruction * * * must be made on the record after the jury is instructed and before it retires to deliberate." Berman v. Sitrin, 101 A.3d 1251, 1266 (R.I. 2014) (emphasis added) (internal quotation marks omitted). In view of that clear precedent, and in light of the amount of time that elapsed between the trial justice's supplemental instruction and defense counsel's alternative instruction, we are not persuaded that defendant's objection was timely.

The defendant argues that our opinion in State v. Fetzik, 577 A.2d 990 (R.I. 1990), supports her contention that her objection (which came in the form of an alternative instruction) which was articulated on the day after the trial justice gave his supplemental instruction was sufficient to preserve the issue for appellate review. However, we are not persuaded by that argument. In Fetzik, 577 A.2d at 992-93, the defendant proposed an instruction with respect to the defendant's physical condition at the time of the crime to the trial justice before the trial justice charged the jury, albeit after the close of evidence. Pursuant to Rule 30 of the Superior Court Rules of Criminal Procedure, "when a defendant relies upon an affirmative defense or justification or a matter in mitigation he or she must advise the court no later than the close of evidence." Fetzik, 577 A.2d at 992 (emphasis added). However, we stated in Fetzik that, "[a]lthough the instruction was technically late, the trial justice appears to have had an adequate

- 24 -

opportunity to consider this instruction" regarding the defendant's physical condition, especially in light of extensive testimony documenting said condition, and that "[t]he requested instruction was one that could easily have been included with those that were given." Id. at 993. Those circumstances are clearly distinguishable from those at issue in the instant case. Here, the trial justice had <u>no</u> opportunity to consider the substance of defense counsel's alternative instruction because the proposal did not arrive until the next morning, after the supplemental instruction had been given and the jury had resumed deliberations. For similar reasons, defendant's alternative instruction could <u>not</u> have easily been included with the supplemental instruction. Simply put, in the instant case, the objection (in the form of the alternative instruction) was not timely, and our opinion in <u>Fetzik</u> does not support the contention that the issue was somehow preserved.

The defendant argues that, even if the argument relative to the proposed alternative instruction was not preserved during the actual trial, it has been "preserved for direct appeal as it was included in the Rule 33 New Trial Motion and ruled on by the Trial Court on the merits." But that argument flies in the face of our precedent. In <u>State v. Flori</u>, 963 A.2d 932, 938 (R.I. 2009), we specifically stated: "Although * * * [R]ule [33] allows the court to grant a new trial if required in the interest of justice, it does not circumvent or override contemporaneous objection rules, such as Rule 30." (Internal quotation marks omitted.) We see no reason to deviate from that principle in the instant case; defendant did not timely object because she did not timely provide her alternative instruction, and her failure to do so was not cured by her decision to raise the issue in her motion for a new trial.

Third, defendant claims that the issue is "properly before the Court as the State failed to object to the timing of counsel's objection." We are not persuaded by this argument. The state did not need to present an objection to defendant's untimely proposal for an alternative

instruction where the trial justice explicitly ruled <u>against</u> giving that instruction; defendant's argument in this regard is meritless, and we summarily reject it.

Finally, we note that a trial is one-directional in nature; it moves forward from beginning to end. And essential to the trial process is the requirement that objections be made at the time when an event occurs that counsel deems objectionable. <u>See</u> Rule 51 of the Superior Court Rules of Criminal Procedure ("Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, <u>at</u> <u>the</u> <u>time</u> <u>the</u> <u>ruling</u> <u>or</u> <u>order</u> <u>of</u> <u>the</u> <u>court</u> <u>is</u> <u>made</u> <u>or</u> <u>sought</u>, makes known to the court the action which the party desires the court to take or his or her objection to the action of the court * * *.") (emphasis added); <u>see</u> <u>also</u> In re Jazlyn P., 31 A.3d 1273, 1280 (R.I. 2011) ("An issue is properly preserved—and, as a result, may be raised before this Court on appeal—if the litigant's objection was both '<u>timely</u> and <u>appropriate</u>.'") (emphasis added) (quoting <u>State v. Brown</u>, 9 A.3d 1240, 1245 (R.I. 2010)); <u>see</u> <u>generally</u> Thomas v. Ross, 477 A.2d 950, 953 (R.I. 1984) ("Trial on an installment-plan basis cannot be countenanced * * *."). In addition, it is required that the objecting party not only voice the objection contemporaneously with the perceived error, but it is further required that all grounds for the objection be brought to the attention of the presiding judicial officer at that time. <u>See</u> State v. Hallenbeck, 878 A.2d 992, 1007 (R.I. 2005); <u>see</u> <u>also</u> State v. Figuereo, 31 A.3d 1283, 1289 (R.I. 2011). In the instant case, as soon as the question posed by the jury had been addressed by the trial justice, the jury continued deliberating. For the court on the next morning to have given a further supplemental instruction might well have unduly been perceived by the jurors as a sort of red flag, causing them to infer that the trial justice was imparting some sort of cryptic message.

Accordingly, we hold that defendant has failed to preserve her objection to the supplemental jury instruction.

**B**

**The Motion for a New Trial**

The defendant next argues on appeal that the trial justice erred when he denied her motion for a new trial. She contends: (1) that the trial justice erred in crediting Mr. German's unsigned statement, which was testified to by Trooper Alboum; and (2) that her conviction was based on insufficient evidence. Specifically, she claims that the jury did not find Mr. German's unsigned statement to the police to be credible—whereas, if the jury found the statement to be credible, it could infer that defendant knowingly possessed the marijuana. Indeed, she argues that the unsigned statement was so undermined by Mr. German's criminal record, his purported connection to the carjacking earlier that day, and his subsequent contradictory statements, that no jury could have found that the unsigned statement was worthy of credence. In addition, she claims that it was not reasonable to conclude that she could have smelled the fresh marijuana in the trunk in view of the evidence that Mr. German, sitting in the front passenger's seat, "reeked" of burnt marijuana. Therefore, she argues it could not be properly inferred that defendant knew that there was marijuana in the trunk. We hold, for the reasons set forth below, that the trial justice properly denied defendant's motion for a new trial.

Preliminarily, we note that defendant's appeal utilizes the language of both a motion for a new trial based on the weight of the evidence and a motion for a new trial based on the sufficiency of the evidence. As we have explained in State v. Perkins, 460 A.2d 1245, 1247 (R.I. 1983), the two motions are different, and each requires its own distinct legal analysis. See also State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011); State v. Clark, 974 A.2d 558, 569-71 (R.I.

- 27 -

2009).  It is not entirely clear to this Court whether defendant intends to argue both bases for the motion.  However, to the extent that she in fact seeks to raise both, we shall address each basis.

When a defendant moves for a new trial based on both the weight of the evidence and the sufficiency of the evidence, it is the practice of this Court to first address the motion based on the weight of the evidence.  See State v. Robat, 49 A.3d 58, 72 (R.I. 2012) (stating that this Court reviews a motion for a new trial before reviewing a motion for a judgment of acquittal); State v. Richardson, 47 A.3d 305, 317 (R.I. 2012); see also Clark, 974 A.2d at 570 ("The difference in nomenclature of a motion for a new trial based on the insufficiency of the evidence and a motion for judgment of acquittal does not mean that courts must review these motions differently."). We proceed in that manner because a defendant seeking to prevail on a motion for a new trial based on the sufficiency of the evidence bears a heavier burden than does a defendant seeking to prevail on a weight of the evidence argument; unless a defendant can demonstrate that the evidence failed to support his or her conviction based on the weight of the evidence standard, he or she will necessarily be unable to establish entitlement to a new trial based on insufficient evidence.  See Robat, 49 A.3d at 72.

When a trial justice considers whether a verdict is against the weight of the evidence, he or she "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence."  State v. Barrios, 88 A.3d 1123, 1128 (R.I. 2014) (internal quotation marks omitted); see also State v. Austin, No. 2013-77-C.A., 2015 WL 1954726, at *6 (R.I. May 1, 2015); Robat, 49 A.3d at 70.  In carrying out his or her role as the "thirteenth juror," it is incumbent upon the trial justice to "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from

that reached by the jury." State v. Silva, 84 A.3d 411, 416 (R.I. 2014) (internal quotation marks omitted); see also State v. Mitchell, 80 A.3d 19, 30 (R.I. 2013). If, after carrying out that just-described analytical process, "the trial justice agrees with the jury's verdict or determines that reasonable minds could differ, then the analysis is complete and the verdict should be affirmed." State v. Hie, 93 A.3d 963, 974-75 (R.I. 2014) (internal quotation marks omitted); see also State v. Harrison, 66 A.3d 432, 445 (R.I. 2013); State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012). However, if the trial justice "does not agree with the verdict or does not agree that reasonable minds could differ, then the trial justice must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." Harrison, 66 A.3d at 445 (internal quotation marks omitted); see also State v. Gonzalez, 56 A.3d 96, 102 (R.I. 2012).

We have stated that the trial justice's decision to grant or deny a motion for a new trial "should reflect a few sentences of the justice's reasoning on each point." State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010) (internal quotation marks omitted); see also Silva, 84 A.3d at 417. The trial justice "need not refer to all the evidence supporting [his or her] decision," but need only "cite evidence sufficient to allow this [C]ourt to discern whether the [trial] justice has applied the appropriate standards." Robat, 49 A.3d at 71 (internal quotation marks omitted).

In reviewing a motion for a new trial, this Court accords great weight to the trial justice's decision so long as he or she has "articulated sufficient reasoning in support of the ruling." Robat, 49 A.3d at 71 (internal quotation marks omitted); see also Hie, 93 A.3d at 975. Our case law is clear that "we will not disturb a trial justice's decision with respect to a motion for a new trial unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." Hie, 93 A.3d at 975 (internal quotation marks omitted); see also Robat, 49 A.3d at 71. We defer to the

trial justice's findings "because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." Robat, 49 A.3d at 71 (internal quotation marks omitted); see also Austin, 2015 WL 1954726 at *7.

In the instant case, the record makes clear that the trial justice properly performed the three-step weight of the evidence analysis. First, he considered the evidence in light of the jury charge regarding constructive possession of marijuana; he expressly noted that it was clear from his jury instruction that, "in order to find the defendant guilty * * * the State had to prove beyond a reasonable doubt that the defendant possessed the [marijuana], * * * and did so knowingly and intentionally." While the trial justice did not refer to every single piece of evidence, he focused on all of the evidence relevant to the issue of defendant's knowledge. See Robat, 49 A.3d at 71. That evidence consisted of the testimony of Mr. German and Trooper Alboum, and Mr. German's unsigned and signed police statements.

Proceeding to the second step of the analytical process, the trial justice independently assessed the credibility of the witnesses and weighed the relevant evidence. He began this second step of the process by focusing on Mr. German's credibility, noting that Mr. German was a "hostile" and "evasive" witness who sought to "undermine whatever he had put in writing at an earlier time." Nonetheless, the trial justice independently concluded that there was "some credibility" to Mr. German's unsigned statement, which indicated that the marijuana belonged to Ms. Mendez. In contrast, he stated on the record that he "specifically * * * disbelieve[d]" those portions of Mr. German's signed statement in which he indicated that the marijuana was all his and that he would be "'taking the hit for it.'"

- 30 -

The trial justice then carried out the remainder of the second analytical step by identifying several specific facts weighing in favor of the jury's verdict. Those facts included: (1) the "strong" smell and sheer "bulk" of the marijuana bales that the state introduced as evidence; (2) Trooper Alboum's testimony that Ms. Mendez did not look at the large police presence surrounding the carjacked van; and (3) Trooper Alboum's testimony regarding the efforts of Ms. Mendez to avoid being pulled over. With regard to the smell and size of the marijuana (the marijuana having been admitted as a full exhibit at trial), the trial justice noted:

> "The State's attorney flung the marijuana around on the witness stand and the boxes in front of the Court. The Court noticed it. The jury noticed it. * * * This is not the same as a small package of controlled substances that can be secreted in a foot locker or * * * under a spare tire, in a jacket, or even in a bag."

The trial justice concluded that those facts, coupled with Mr. German's "statements [that] all allowed for a reasonable inference that [defendant] knew about the marijuana or knew that there was marijuana in the back of her car," clearly supported the jury's verdict.

Third and finally, the trial justice concluded the three-step analytical process by explicitly stating that he agreed with the jury's verdict. In light of the trial justice's proper execution of the three-step analysis and his agreement with the jury verdict, he was not required to do anything further. See Hie, 93 A.3d at 977.

The trial justice properly undertook the required steps to rule upon a motion for a new trial, but we pause to note that, in the course of making his ruling, the trial justice distinguished the instant case from two cases that defendant relied upon heavily in both her briefing and argument on the motion below and before this Court. The two cases are State v. Berroa, 6 A.3d 1095 (R.I. 2010), and United States v. Chadwick, 393 F. Supp. 763 (D. Mass. 1975), aff'd, 532 F.2d 773, 785 (1st Cir. 1976), aff'd, 433 U.S. 1, 16 (1977). The defendant cited those opinions

in support of her argument that the jury could not properly infer her knowledge of the marijuana because the evidence relied upon by the state to indicate that she had such knowledge was subject to equally plausible, noncriminal explanations. In the first case, Berroa, 6 A.3d at 1099, a defendant was found driving a car in which two passengers had concealed cocaine inside their purses. The defendant in that case then allegedly showed signs of nervousness while police investigated the car. Id. We vacated the judgment of conviction because the evidence "simply [was] not sufficient to affirm the conviction," even though the facts could have led to "speculation or conjecture" regarding the defendant's involvement with a sophisticated drug-trafficking scheme. Id. at 1102, 1104.

In the second case, Chadwick, 393 F. Supp. at 766, 768, a defendant was arrested on suspicion of drug trafficking because he was found in the presence of two people who possessed a footlocker containing marijuana. The United States District Court for the District of Massachusetts determined that the police did not have probable cause to arrest the defendant because "a non-criminal explanation * * * [was] at least as likely as one indicating that an offense [had] been or [was] being committed." Id. at 768 (internal quotation marks omitted).

In the instant case, defendant argues that, similar to the facts in Berroa and Chadwick, the "facts and circumstances" of her case, taken together, are "consistent with a reasonable hypothesis that she is innocent"—i.e., that the facts and circumstances are consistent with ignorance of, rather than knowledge of, the presence of marijuana in her car. However, in ruling on the motion, the trial justice pointed to specific facts indicating otherwise, such as Mr. German's unsigned statement implicating defendant's knowledge of the marijuana, the strong smell and sheer bulk of the marijuana in the car operated by defendant, Trooper Alboum's testimony that defendant did not look at the police presence surrounding the carjacked van, and

Trooper Alboum's additional testimony that defendant attempted to avoid being pulled over. The trial justice then stated: "I am sure that lightning didn't strike twelve times in the same place on that day when this case occurred. Any one of [the facts] by themselves might have been insignificant, but it would appear that there were a number of places here where the inferences can be drawn in light of the instructions I told the jury." Furthermore, in her briefing to this Court, defendant concedes that only "[o]nce the incredulous [sic] statements of Osvaldo German and smell issues are set aside" would her case be "on point" with Berroa and Chadwick. As we have already discussed, the trial justice concluded that Mr. German's incriminating original unsigned statement and the smell of the marijuana were both highly relevant to the determination of defendant's guilt in this case.

We see no reason to disturb the trial justice's findings. He considered all of the relevant evidence as he applied the three-step analytical process and he articulated sufficient reasoning to support his decision to deny the motion.

In light of the fact that defendant could not successfully prevail on her motion for a new trial based on the weight of the evidence, we need not address her challenge to the sufficiency of the evidence. See Richardson, 47 A.3d at 317; Clark, 974 A.2d at 570. Accordingly, we affirm the trial justice's denial of defendant's motion for a new trial.

C

**The Sentence**

The defendant's final argument on appeal is that her twenty-year prison sentence is "manifestly excessive" and "violates the constitutional requirement that 'all punishments ought to be proportioned to the offense.'" See R.I. Const. art. 1, sec. 8. We have consistently and repeatedly held that "review of a sentence must begin in the Superior Court pursuant to Rule 35

of the Superior Court Rules of Criminal Procedure." State v. Storey, 102 A.3d 641, 649 (R.I. 2014); see also Lynch v. State, 86 A.3d 390, 390 n. 1 (R.I. 2014) (mem.); Jaiman v. State, 55 A.3d 224, 232 (R.I. 2012) ("[U]nder Rule 35(a) of the Superior Court Rules of Criminal Procedure, [t]he court may correct an illegal sentence at any time.") (internal quotation marks omitted). The parties do not dispute that no Rule 35 motion was made below. Accordingly, the issue is not properly before this Court. See Lynch, 86 A.3d at 390 n. 1.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    State v. Elizabeth Mendez.

**CASE NO:**    No. 2013-13-C.A.
(P1/11-179C)

**COURT:**    Supreme Court

**DATE OPINION FILED:**  June 15, 2015

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice William E. Carnes, Jr.

**ATTORNEYS ON APPEAL:**

    For State:  Aaron L. Weisman
            Department of Attorney General

    For Defendant:  Joseph J. Voccola, Esq.